ROBERT J. GRIFFIN AND WIFE, FRANCES C. GRIFFIN v. WHEELER-LEONARD & CO., INC.; LONNIE E. WHEELER; M. D. FLETCHER, JR. AND WIFE, BONNIE T. FLETCHER, AND M. D. FLETCHER CONSTRUCTION COMPANY, INC.

No. 71

(Filed 17 June 1976)

1. Sales § 5; Vendor and Purchaser § 6— statements by real estate agent — no express warranty

Statements by a real estate agent that water in the crawl space of a house he was attempting to sell plaintiffs was "probably" left over from construction and that it "should" dry up in a short time now that everything was covered over and water couldn't get in there anymore were insufficient to constitute an express warranty that water in the crawl space would cause no problems.

2. Sales § 5; Vendor and Purchaser § 6— statement by real estate agent — no express warranty

A statement by a real estate agent that the contractor who built a house the agent was attempting to sell plaintiffs "was a good contractor and he built good homes and that they were substantial" did not constitute an express warranty that the house would be constructed in a workmanlike manner.

3. Fraud § 3— concealment of material fact

Where there is a duty to speak, the concealment of a material fact is equivalent to fraudulent misrepresentation.

Griffin v. Wheeler-Leonard & Co.

4. **Fraud § 12; Vendor and Purchaser § 6— cause of water accumulation — nondisclosure by real estate agent — insufficient evidence of fraud**

The evidence did not entitle plaintiffs to have submitted to the jury an issue of fraudulent nondisclosure by defendant real estate agent of the cause of water accumulation in the crawl space under a house where there was no evidence that the agent knew that the house had been constructed so that there would, or likely would, be a continuing water problem in the crawl space, and all the evidence tended to show that, at the time of the transactions with plaintiffs, the agent thought the water accumulation was a mere incident of construction and, once dried out, there would be no further water accumulation under the house.

5. **Sales § 6; Vendor and Purchaser § 6— sale of house — implied warranty of builder-vendor**

In every contract for the sale of a recently constructed dwelling or a dwelling then under construction, the vendor, if he be in the business of building such dwellings, shall be held impliedly to warrant to the initial vendee that, at the time of the passing of the deed or the taking of possession by the initial vendee (whichever first occurs), the dwelling, together with all its fixtures, is sufficiently free from major structural defects, and is constructed in a workmanlike manner, so as to meet the standard of workmanlike quality then prevailing at the time and place of construction.

6. **Sales § 6; Vendor and Purchaser § 6— sale of house — implied warranty — visible defects**

The implied warranty of a builder-vendor does not extend to defects of which the purchaser had actual notice or which are or should be visible to a reasonably prudent man upon an inspection of the dwelling.

7. **Sales § 6; Vendor and Purchaser § 6— sale of house — breach of implied warranty — damages**

Where there is a breach of the implied warranty of a builder-vendor, the vendee can maintain an action for damages for such breach either (1) for the difference between the reasonable market value of the subject property as impliedly warranted and its reasonable market value in its actual condition, or (2) for the amount required to bring the subject property into compliance with the implied warranty.

8. **Sales § 17; Vendor and Purchaser § 6— breach of implied warranty by builder-vendor — sufficiency of evidence**

Plaintiffs' evidence was sufficient for the jury on the issue of breach of implied warranty by the builder-vendor of a house sold initially to plaintiffs where it tended to show: water accumulated in the crawl space under the house; an extended period of wet weather and heavy rains had preceded plaintiff's purchase of the house; plaintiffs relied on a statement by the real estate agent that the water was probably left over from construction and should dry up shortly after the rain stopped; the water accumulation was actually caused by inadequate waterproofing of the foundation to cope with water

drainage caused by poor porosity of the soil where the house was built; the top window sashes of several windows would not stay up properly; water passed underneath the garage door whenever it rained fairly hard; and a dwelling with the aforesaid defects did not meet the standard of workmanlike construction then prevailing in the county.

**9. Sales § 6; Vendor and Purchaser § 6— contract of purchase — provision not exclusion of implied warranty**

A provision in a contract of purchase of a dwelling "that no representations or inducements have been made other than those expressed herein, and that this contract contains the entire agreement between all parties hereto" did not constitute an agreement between the builder-vendor and the purchaser that no implied warranty was applicable to their transaction.

**10. Sales § 6; Vendor and Purchaser § 6— wife of builder-vendor — no liability for implied warranty**

While the wife of the builder-vendor of a dwelling signed the deed of conveyance to plaintiffs as a grantor and vendor of the property, no issue arose as to her liability for any breach of the implied warranty of a builder-vendor where the record contained no evidence that she was in the construction business or had any part in building the dwelling.

Justices COPELAND and EXUM did not participate in the consideration or decision of this case.

ON *certiorari* to review the decision of the Court of Appeals, reported in 22 N.C. App. 323, 206 S.E. 2d 313 (1974), which found no error in the judgment entered by *Chief District Court Judge Moore* on 22 October 1973, District Court of DURHAM County, docketed and argued as Case No. 72 at the Fall Term 1974.

Plaintiffs instituted this action for damages allegedly sustained in connection with their purchase of a new residence, constructed on Lot 9, Block A, Section II of Bluestone Estates, a subdivision in Durham County containing approximately 99 lots.

At one time all the land in Bluestone Estates was owned by W. F. Construction Company, "a land development corporation to hold land and to sell it for the purpose of constructing houses, new homes." The W. F. Construction Company is not a party to this suit. At all times pertinent to this litigation, defendant Lonnie E. Wheeler was the president of W. F. Construction Company and owned one-half of its stock. The other half was owned by defendant M. D. Fletcher, Jr. (Fletcher),

who was also a corporate officer. On 13 November 1970 title to the lot on which the house in suit was built (Lot No. 9) was in Fletcher and wife, Bonnie T. Fletcher. Fletcher, who described himself as a "builder of good quality homes" and "in the construction business on a full-time basis," built the house which he and his wife conveyed to plaintiffs by deed dated 18 December 1970. The money from that sale went to Fletcher and his wife.

Defendant Wheeler-Leonard & Company, Inc. (Wheeler-Leonard, Inc.) is a "broker of insurance and real estate." It had no interest in the residence which defendants Fletcher sold plaintiffs. However, as the W. F. Construction Company's sales agent for all the new houses in Bluestone Estates, it negotiated the sale to plaintiffs through its employee, defendant Lonnie E. Wheeler (Wheeler). For his services Wheeler-Leonard, Inc. received a commission of 5% on the purchase price. Wheeler, a salaried employee, owned one-third of the stock of Wheeler-Leonard, Inc.

Plaintiffs alleged that, after occupying the residence in suit, they discovered construction defects which rendered its value substantially less than the purchase price. They based their claim against Fletcher and wife (builder-vendors) upon a breach of implied warranty. As against Wheeler-Leonard, Inc. and Wheeler (brokers), their asserted claim rests upon express warranty and "misrepresentation." Plaintiffs alleged a claim against "M. D. Fletcher Construction Company, Inc." for negligence in the construction of the house on Lot No. 9. The record, however, suggests that there is no such corporation as "M. D. Fletcher Construction Company, Inc." and that Fletcher built the residence in suit "acting as a sole proprietorship."

At the close of plaintiffs' evidence, upon the motion of Mr. Blackwell M. Brogden, attorney for all the defendants, the court dismissed the action against "M. D. Fletcher Construction Company, Inc." Plaintiffs did not appeal that ruling.

Plaintiffs' evidence tended to show the following facts:

In November 1970 plaintiff Robert J. Griffin (Griffin) moved his family from Southern Valley, Nevada, to Durham County, North Carolina. In the course of seeking a residence in a development convenient to the Research Triangle Park (where he worked), Griffin met Wheeler about 12 November

1970. Wheeler then showed him the house in Bluestone Estates which he later purchased. The house was one-story with a crawl space underneath. Griffin testified:

"The first time I was there . . . [w]e did look under the crawl space. Under the crawl space it was wet, very wet. There was standing water underneath the house. . . . It had been very wet and rainy. They told me that it had rained constantly for almost the entire month. Mr. Wheeler wasn't with me when I looked at the crawl space. He was inside the house. You can't look into the crawl space of the house from the inside of the house. The property is sloped and the crawl space entrance is on the low side of the house in the back. I did make a comment to Mr. Wheeler about what I saw in the crawl space. When I got back into the house, I asked him about the water underneath and he just made the comment that it was probably left over from construction and that it should dry up in a short time now that everything was covered over and water couldn't get in there any more."

. . . .

"He said it was merely left over from construction and that it would probably dry up. I asked him questions on quality of the house and how these things were done in North Carolina. The warranties, guarantees, and things like that, and he responded in the affirmative to all of my questions."

. . . .

"I asked him about the contractor who built the house and he said the contractor was a good contractor. There was a big sign there that said Fletcher Construction Company. . . . He said he was a good contractor and he built good homes and that they were substantial."

On the following day plaintiffs obtained the key from Wheeler's office and made a thorough inspection of the house in question. Wheeler was not with them on this occasion. Thereafter they decided to buy it and, on 13 November 1970, they signed a contract to purchase the property for $29,400.00, provided they would be able to secure the necessary financing. Prior to signing the contract of purchase, plaintiffs discussed with Wheeler a list of uncompleted items which they had prepared on their second inspection of the premises. The house had not been shown to them as completed. "There were still some construction things to do. But the house was 99 per cent or

Griffin v. Wheeler-Leonard & Co.

more complete." The list of eighteen uncompleted items (none of which are now in issue) was incorporated in the contract as "Attachment # 1" in a paragraph headed "Other conditions."

Plaintiffs, Griffin and wife, signed the contract on the lines indicated for "buyer" and, on the line designated "seller," Wheeler signed "W. F. Construction Company by Lonnie E. Wheeler, Pres." (Wheeler testified that he was then inadvertent to the fact that he had previously deeded Lot No. 9 to Fletcher and wife.) This contract of purchase, on the standard printed form used by Wheeler-Leonard, Inc., contained the following provision:

"Buyer hereby acknowledges that he has inspected the above described property, that no representations or inducements have been made other than those expressed herein, and that this contract contains the entire agreement between all parties hereto."

Griffin further testified that, at the time of signing the contract in Wheeler's office:

"I mentioned the water under the house and I also mentioned the fact that there was no light in the upstairs. I don't know if that's on this list [Attachment # 1] or not, but there should be a light in the attic and there was not. We mentioned that and we mentioned clean up of the property where there had been construction. This list was supposed to be completed construction items. This was not objections we had to other things. When we mentioned the water to Mr. Wheeler again, he mentioned that it should dry up. He made no statements about the water that we had observed under the crawl space of the house other than it should dry up shortly as soon as the— it had been raining constantly and the back yard also was one giant mud puddle, but I couldn't see any problem with this, because it had been raining. I mean everything around here was saturated and so I saw nothing wrong with that."

About two days after the purchase contract was signed, plaintiffs moved into the house under an agreement to pay $4.00 per day rent until the transaction was closed. The transaction was closed on 28 December 1970. The deed to plaintiffs, dated 18 December 1970, was signed by M. D. Fletcher, Jr., and wife, Bonnie T. Fletcher, as the owners in fee of the property. It was acknowledged and recorded on 28 December 1970.

Griffin v. Wheeler-Leonard & Co.

Thereafter, for more than two years prior to the institution of this action on 3 August 1972, plaintiffs were in frequent communication with defendants Wheeler and Fletcher, and with Fletcher's construction foreman, Micky Ellis, with reference to remedying defects in the property, several of which were not on the list of items listed in Attachment # 1 to the purchase contract. However, at no time did plaintiffs ever have any contact with Mrs. Fletcher. For almost a year nothing was done. In consequence of an inspection by the county building inspector, Fletcher put vents in the attic, where the temperature was 123° on a 78° day, and drainage tile was placed around the foundation of the house.

Notwithstanding, water puddled continuously in the crawl space under the house and constituted plaintiffs' number-one problem. In consequence of perpetual dampness beneath the house the humidity inside the house was always exceptionally high. Water condensed on the windows to the extent that it streamed off the windowsills. In April 1971 Griffin wrote Fletcher that "a stream ran through a hole on the low side of the [foundation] wall the last couple of times it rained." Surfacing water and gas from septic tanks also created problems. Effluent from plaintiffs' septic tank and the one next door ran across plaintiffs' yard. Green alga grew in its wake. Construction debris remained in the backyard, which was still unlandscaped.

At the trial Griffin testified that all defects had then been corrected "except the water problem underneath the house and the situation where water runs underneath the garage door every time it rains fairly hard, and the window sashes were still loose." (The upper sash would fall when the window was unlocked or the lower sash was raised.) Moisture remained in the crawl space despite some efforts by defendants in January 1972 and March 1973 to correct the condition.

Griffin further testified that before moving to North Carolina, while living in Nevada, he had become a licensed real estate salesman and, working part-time, he had "sold maybe 15-20 houses." In Southern Nevada, which has a very dry climate, he had never seen houses constructed with crawl spaces similar to those in the Durham area. Further, he did not know about the poor porosity of the clay subsoil in the southern part of Durham County and the special water drainage problems in the

Bluestone Estates area until after he had moved into the house in suit.

Griffin's complaint to the Durham-Chapel Hill Builders' Association Ethics Committee on 20 November 1971 caused its chairman, Mr. Stewart Pickett, to talk with Wheeler and to "ride by the property." The testimony of Mr. Pickett, an experienced general contractor who had been building residences in the Durham-Chapel Hill area for the past fifteen years, tended to show:

The house had obviously not been completed in its final details at the time he rode by on 22 November 1971. In response to a second written complaint from Griffin advising him that the defects in his residence had not been remedied in early 1973, Pickett examined the crawl space and observed that "there was a moisture problem." A couple of weeks before the trial he again inspected the property and found dampness in the crawl space although it had not rained for several weeks. Finding no evidence of a spring or other source of subterranean water, he concluded that surface water runoff drained into the crawl space through or under the foundation wall. He outlined the measures he would take to prevent water from getting under the house and estimated the necessary work would cost approximately $2,200.00. He further testified that moisture in the crawl spaces beneath a dwelling will cause the floors to swell, create condensation problems in the walls and in the attic, and make the windows sweat so that water will run down on the windowsills. If not corrected, such moisture will eventually cause the floor system to mildew, a situation which brings in termites and other insects. If the moisture is severe enough it may eventually cause the roof line to buckle.

Plaintiffs' witness Wynne, the Durham County Building Inspector during the years 1970, 1971, and 1972, testified that he had made the preliminary inspection of the footings and framing of the Griffin residence when it was under construction; that final inspections are not made until after the property is occupied. In response to complaints from Griffin, who was then occupying the dwelling, he visited the property and found "some things that needed to be taken care of." In consequence he went to Fletcher's office and told him that "some things that needed to be taken care of were vents on the outside of the eaves of the house, underneath that, and then

they had dampness underneath the house in the crawl space." Fletcher told Wynne that he had already ordered the vents and that he was going to take steps to correct the moisture in the crawl space.

Inspector Wynne further testified that Section 17 of the North Carolina Uniform Residential Building Code ("in full force and effect in Durham County in the year 1970") provides: "Where the finished grade under the building is lower than the outside finished grade, adequate provisions must be made for drainage." Wynne stated that the crawl space under plaintiffs' house was below the outside finished grade; that Section 17 of the Building Code also provides that if the building inspector deems it necessary to do so, foundation walls below adjacent ground levels shall be rendered waterproof or dampproof as conditions require; and that he had not required Fletcher to take any particular precautions as a result of his inspection of the footings and the framing of the Griffin house.

Defendant Fletcher, who had been in the full-time construction business for seven years, was called by plaintiffs as an adverse witness. He testified in substance as follows:

He first saw plaintiffs a few days after the purchase contract was signed. Before the transaction was closed, he went with them to the property in order to go over the list of items to be completed; that nothing was said about water in the crawl space; that he knew the porosity of the soil in the Bluestone Estates area was very poor, but he saw no reason to discuss that with the Griffins. Specifically he said: "Yes, it is fair to say that the porosity of the soil in the Bluestone Estates area is such that it doesn't really absorb water as well as some other areas in Durham County. It is the worst area in Durham County. It's true it's the worst area for septic tanks in Durham County."

When asked why he did not tell plaintiffs about the poor porosity Fletcher replied, "I didn't feel this was my job to tell them it was the worst area in Durham County. . . . The septic tank . . . had been installed. How did I know it was going to work or wouldn't, or would give problems later? I didn't know. It was put in in accordance with Durham County specification. . . . This particular lot the percolation test did pass, and that was the reason I was permitted . . . to build this house. . . . Yes, it is true that sometimes, even when the property passes

a percolation test, you still have problems with the septic tank. Yes, I have had septic tank problems with a few houses in other areas of Bluestone Estates before I met the Griffins."

After plaintiffs moved into the house Fletcher became aware that water was accumulating under their house. He testified: "I do admit, in part, that after the Griffins moved into the house there was water coming through the foundation wall and into the crawl space. I'm not admitting that water was coming through the foundation wall. I don't know where it was coming from. I admit there was dampness and water under the house; I admit that. Yes, after a heavy rain, standing water. Well, I didn't measure it for depth. I don't know how deep it was. It was standing in puddles." In substance, Fletcher agreed with Mr. Pickett's itemization of the damages which moisture in the crawl space beneath a house could cause.

Fletcher testified that on two different occasions he had work done to correct the drainage problem. This work included putting a drain below the footings and waterproofing the foundation walls as he would have done a full basement. Finally, in January or February 1973, he dug a ditch around the house deeper than the footings and installed a "french drain" of pipe and rock, which was supposed to take the water to the back of the lot.

Fletcher said that he had built most of the houses located in the Bluestone Estates subdivision on a speculative basis, and defendant Wheeler, through his real estate company, Wheeler-Leonard, Inc., was the real estate agent who sold the houses on commission. Fletcher had built houses to VA, FHA or conventional loan specifications, depending on how he thought the house would be financed upon sale. He further stated that he had been taken off the approved builders' list for FHA and VA financing. He acknowledged familiarity with the North Carolina Uniform Building Code, specifically those provisions relating to waterproofing and damp-proofing of crawl space areas.

Defendant Wheeler, a licensed real estate broker, testifying for himself, gave testimony which tended to show:

When he accompanied plaintiffs on their first inspection visit to the property there were no discussions about water under the house or anything like that, and he made no war-

ranties of any kind. When the purchase contract was signed on 13 November 1970 he made no representations, inducements or warranties, and there was no mention of water in the crawl space. There was only a discussion of the several items listed on Attachment # 1 to the contract form. He further testified: "No, at no time was I an agent of M. D. Fletcher, Jr. I was not his agent in the construction business. I acted in no capacity other than as officer of this corporation."

Defendant Wheeler further testified that it is a fairly usual occurrence to get water in a crawl space during the construction of a house, indicating that could have been taken as the explanation of the presence of water there when plaintiffs first inspected the house. He specifically denied making any statement to plaintiffs about the problem of water in the crawl space until after they had moved into the house. He said that, about ten days before the transaction was closed, Griffin called him on the telephone and asked "what the water was under there" and he told him, " 'Mr. Griffin, I don't know. It could be because it is coming from the rainy weather. I don't know, but let's let it dry up. Let it dry up and if it doesn't dry up, then call me back.' He did in January."

Wheeler also conceded that he knew the Bluestone Estates area was one of the worst in Durham "with respect to the porosity of the soil," and that he had not told plaintiffs "they were looking at a house in an area of the county that had known septic tank problems and known problems with respect to the porosity of the soil." Ordinarily, Wheeler testified, upon getting construction loans for speculative houses built by Fletcher in Bluestone Estates, title to the lot remained in the W. F. Construction Company, the developer of the subdivision. However, through some inadvertence in handling the construction loan papers on the Griffin house property, the lot had been deeded to Fletcher and his wife. They were, therefore, the record owners at the time of the sale to plaintiffs.

At the close of all the evidence, plaintiffs moved under G.S. 1A-1, Rule 15 (b) to amend their complaint to allege (1) that they had entered into a contract with W. F. Construction Co., Inc., to purchase the house which was deeded to them by Fletcher and wife, and (2) that the house was built by M. D. Fletcher, Jr., acting as a sole proprietorship instead of by M. D. Fletcher Construction Company. The motion to amend was denied. Motions by defendants Wheeler-Leonard & Co., Inc.,

Lonnie E. Wheeler, M. D. Fletcher, Jr., and wife, Bonnie T. Fletcher, for directed verdicts were allowed.

Upon plaintiffs' appeal, the Court of Appeals sustained the directed verdicts for defendants on the ground that, having failed to establish that the house was unfit for habitation, plaintiffs had failed to establish their right to recover. We allowed certiorari.

*Powe, Porter, Alphin & Whichard, P. A. by J. G. Billings for plaintiff appellants.*

*Blackwell M. Brodgen for defendant appellees.*

SHARP, Chief Justice.

Plaintiffs base their contention that the Court of Appeals erred in affirming the trial court's directed verdict for defendants Lonnie E. Wheeler, Wheeler-Leonard Co., Inc., M. D. Fletcher, Jr., and wife, Bonnie T. Fletcher upon the following grounds:

*First,* the evidence tending to establish a breach of an express warranty by Wheeler and Wheeler-Leonard, Inc., was sufficient for submission to the jury.

*Second,* the evidence tending to show a fraudulent nondisclosure of material facts by Wheeler and Wheeler-Leonard, Inc., while acting as broker for Fletcher in negotiating the sale of residential property to plaintiffs was sufficient to take that issue to the jury.

*Third,* there was substantial evidence of a breach of implied warranty by defendants Fletcher and wife, entitling plaintiffs to go to the jury on that issue.

The foregoing contentions will be considered in the order listed.

According to plaintiff Griffin's testimony, prior to the signing of the purchase contract, Wheeler made the following statements with reference to water in the crawl space and the ability and reputation of the contractor who built the house:

"I did make a comment to Mr. Wheeler about what I saw in the crawl space. When I got back into the house, I asked him about the water underneath and he just made the comment that

it was probably left over from construction and it should dry up in a short time now that everything was covered over and water couldn't get in there any more."

"I asked him questions on quality of the house and how these things were done in North Carolina. The warranties, guarantees, and things like that, and he responded in the affirmative to all of my questions."

In response to a question about the contractor who built the house, Wheeler told Griffin that "he was a good contractor and he built good homes and that they were substantial."

We need not consider whether the admission of some or all of the foregoing testimony violated the rule against the admission of parol evidence which contradicts the terms of a written instrument (the purchase contract) since it was admitted without objection by defendants. *See* 2 Stansbury's N. C. Evidence § 251, n. 2 (Brandis Rev. 1973).

Although denying that prior to the signing of the purchase contract he had made any statement regarding the water problem in the crawl space, Wheeler testified that a few days after the signing of the contract and before the closing of the transaction, in a telephone conversation, Griffin had asked him about the water under the house, and he had replied, "Mr. Griffin, I don't know. It could be because it is coming from the rainy weather. I don't know, but let's let it dry up. Let it dry up and if it doesn't dry up, then call me back."

Are these statements, if made by Wheeler, sufficient (1) to constitute an express warranty that the residence he was attempting to sell plaintiffs, when completed, would be constructed in a workmanlike manner and, specifically, that water in the crawl space underneath the house would create no problems and (2) to support recovery by plaintiffs against Wheeler, Wheeler-Leonard, Inc., or the Fletchers, if a breach is shown? (As to an agent's liability on contracts entered into on behalf of his principal see *Howell v. Smith,* 261 N.C. 256, 134 S.E. 2d 381 (1964); *Walston v. Whitley & Co.,* 226 N.C. 537, 39 S.E. 2d 375 (1946).) Taking plaintiffs' evidence as true and considering it in the light most favorable to them (as we are required to do in considering the sufficiency of the evidence to withstand the motion for a directed verdict, *Anderson v. Butler,* 284 N.C. 723, 202 S.E. 2d 585 (1974); *Kelly v. Har-*

Griffin v. Wheeler-Leonard & Co.

*vester Co.,* 278 N.C. 153, 179 S.E. 2d 396 (1971)), we conclude that the answer is No.

[1]    Wheeler's statements, even assuming he was authorized to make them, were not sufficient to constitute an express warranty, on his own behalf, on behalf of Wheeler-Leonard, Inc., or on behalf of the Fletchers. All that Wheeler said with reference to water in the crawl space was that it was "probably" left over from construction and that it "should" dry up in a short time now that everything was covered over and water couldn't get in there any more. Thus, Wheeler did not expressly say, nor did his words reasonably imply, that he personally assumed a contractual obligation by warranting a dry crawl space.

[2]    The statement attributed to Wheeler, that the contractor who built the house "was a good contractor and he built good homes and that they were substantial," likewise falls far short of constituting an express warranty with respect to the house which plaintiffs purchased. This statement amounted to no more than a general testimonial that the contractor built good, substantial homes. Indeed, the statement did not specifically refer to the particular house which plaintiffs purchased. We would have to strain unduly to find in Wheeler's statement a contractual warranty with respect to plaintiffs' house. *Cf.* N. C. Gen. Stat. § 25-2-312 (2) which provides: "It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he had a specific intention to make a guaranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." *Compare Performance Motors, Inc. v. Allen,* 280 N.C. 385, 186 S.E. 2d 161 (1972).

[3]    With reference to the alleged fraud of defendant Wheeler, it is well settled that where there is a duty to speak the concealment of a material fact is equivalent to fraudulent misrepresentation. *Setzer v. Insurance Co.,* 257 N.C. 396, 126 S.E. 2d 135 (1962) ; *Brooks v. Ervin Construction Co.,* 253 N.C. 214, 116 S.E. 2d 454 (1960). *See also* 4 Strong's N. C. Index 2d, *Fraud* § 3 (1968) and Annot., *Liability of Vendor's Broker or Agent to Purchaser for Misrepresentation as to, or Nondisclosure of, Physical Defects of Property Sold,* 8 A.L.R. 3d 550 (1966).

Plaintiffs rely upon *Brooks v. Ervin Construction Co.,* *supra,* a case in which the defendant-builder had sold the plaintiffs a house and lot. The defendant had constructed the house over a large hole which it had filled with debris and then covered over with clay. The defendant knew, or should have known, that a house built on "disturbed soil" will settle and material damage result. In reversing a judgment of nonsuit, this Court said: "Since this defect in the lot and the house built centered over it was not apparent to plaintiffs and not within the reach of their diligent attention and observation, defendant was under a duty to disclose this information to plaintiffs. Plaintiffs' evidence makes out a case of actionable fraud sufficient to carry the case to the jury." *Id.* at 219, 116 S.E. 2d at 458.

[4] The Brooks case, however, does not require a reversal of the directed verdict in favor of Wheeler and Wheeler-Leonard, Inc. In this case defendant Wheeler did not build the Griffin house. There is no evidence whatever that Wheeler *knew* that the Griffin house had been constructed so that there would, or likely would, be a continuing water problem in the crawl space. The fact that Wheeler knew the condition of the soil in Bluestone Estates and knew of its poor porosity does not mean that he knew the house had, in fact, not been properly constructed to allow for that condition. Plaintiffs' own witness, Pickett, testified that the foundation of the house could have been constructed so that there would have been no continuing water problem beneath the house. Further, he outlined the measures which could still be taken to eliminate this condition and gave his estimate of their costs.

Had plaintiff shown (1) that, at the time he signed the contract with plaintiffs, defendant Wheeler knew, or had reason to believe, that the builder had not properly waterproofed the foundation of the house, and (2) that defendant Wheeler had withheld this fact from plaintiffs, such nondisclosure would have come within the rule applied in the Brooks case. However, all the testimony bearing upon this point, that offered by plaintiffs as well as by defendants, tended to show that, at the time of his transactions with plaintiffs, Wheeler thought the water accumulation underneath the house was a mere incident of construction and, once dried out, there would be no further water accumulation under the house.

We hold that the evidence adduced did not entitle plaintiffs to have the issue of misrepresentation by Wheeler and Wheeler-

Leonard, Inc., submitted to the jury. Whether the evidence in the record was sufficient to have supported an amendment of the complaint and submission of the issue of fraudulent nondisclosure as against defendant Fletcher is not before us. Plaintiffs neither sought to amend their complaint before trial to allege such a theory against Fletcher; nor do they presently contend that the issue was tried below by the implied consent of the parties as provided in N. C. Gen. Stat. § 1A-1, Rule 15(b).

The third question is whether the issue of defendants Fletchers' liability to plaintiffs for the alleged breach of implied warranty should have been submitted to the jury.

This question is answered by our decision in *Hartley v. Ballou,* 286 N.C. 51, 209 S.E. 2d 776 (1974), a case which was pending on appeal in this Court, but undecided, at the time the Court of Appeals rendered its decision in the instant case. *Griffin v. Wheeler-Leonard & Co.,* 22 N.C. App. 323, 206 S.E. 2d 313 (1974).

**[5]**    The rule adopted by this Court as governing implied warranty in the sale of a dwelling by the builder-vendor was stated by Chief Justice Bobbitt as follows:

"[I]n every contract for the sale of a recently completed dwelling, and in every contract for the sale of a dwelling then under construction, the vendor, if he be in the business of building such dwellings, shall be held to impliedly warrant to the initial vendee that, at the time of the passing of the deed or the taking of possession by the initial vendee (whichever first occurs), the dwelling, together with all its fixtures, is sufficiently free from major structural defects, and is constructed in a workmanlike manner, so as to meet the standard of workmanlike quality then prevailing at the time and place of construction; and that this implied warranty in the contract of sale survives the passing of the deed or the taking of possession by the initial vendee." *Id.* at 62, 209 S.E. 2d at 783.

**[6, 7]**    The implied warranty of the builder-vendor does not, of course, extend to defects of which the purchaser had actual notice or which are or should be visible to a reasonably prudent man upon an inspection of the dwelling. Where, however, there is a breach of the implied warranty, the vendee can maintain an action for damages for such breach "either (1) for the dif-

ference between the reasonable market value of the subject property as impliedly warranted and its reasonable market value in its actual condition, or (2) for the amount required to bring the subject property into compliance with the implied warranty." *Id.* at 63, 209 S.E. 2d at 783.

[8]   All the evidence tended to show that an extended period of wet weather and heavy rains had preceded plaintiffs' purchase of the property. As Griffin testified ". . . it had been raining constantly, and the backyard also was one giant mud puddle . . . everything around here was saturated"; so he "saw nothing wrong" with Wheeler's statement that the crawl space "should dry up" shortly after the rain stopped. Under all the circumstances here disclosed we cannot say as a matter of law that plaintiffs could not have reasonably acted on this assumption.

Although plaintiffs were unaware of the admittedly poor porosity of the soil in the Bluestone Estates Subdivision, the condition of the soil was not the latent defect here involved but the absence of adequate construction measures to cope with that condition of the soil so as to prevent rainfall from puddling beneath the house. The condition of the foundation of the house and lack of sufficient waterproofing were defects which a jury could find would not have been discernible to a reasonably prudent person upon inspecting the property at the time of negotiating its purchase. Furthermore plaintiffs' evidence tended to show that at the time of trial two other defects—the failure of the top window sashes of several windows to stay up properly and the passage of water underneath the garage door whenever it rained "fairly hard"—had not been corrected. In addition there was evidence sufficient to go to the jury that a dwelling with these defects did not meet the standard of workmanlike construction then prevailing in Durham County. Thus, the jury could find the house was neither free from major structural defects nor constructed in a workmanlike manner and that therefore it did not meet the prevailing standard of workmanlike quality. Failure to meet this standard would constitute a breach of the implied warranty regardless of whether the house could be deemed "livable."

[9]   Finally, we consider the effect of the last paragraph in the purchase contract, executed on a standard contract form published by the North Carolina Association of Realtors. Plain-

tiffs signed this contract as "buyer," and the signature on the "seller" line is "W. F. Construction Co., Inc., by Lonnie E. Wheeler, Pres." The last paragraph is as follows: "Buyer hereby acknowledges that he has inspected the above described property, that no representations or inducements have been made other than those expressed herein, and that this contract contains the entire agreement between all parties hereto." Defendants contend that since the list of items on Attachment # 1 to the contract did not include water in the crawl space and in the garage or loose window sashes that they have no responsibility for these defects.

The implied warranty here under consideration, applicable to a dwelling sold by a builder, arises by operation of law, not by specific factual agreement between the parties. Without question, however, a builder-vendor and a purchaser could enter into a binding agreement that such implied warranty would not apply to their particular transaction.

Does the language in the last paragraph of the purchase contract constitute an agreement between defendant Fletcher and plaintiffs that no implied warranty is applicable to their transaction? The answer is clearly No.

On its face this last paragraph purports to exclude only those "representations or inducements" which are not set out in the written contract. The implied warranty of workmanlike quality of construction does not exist by reason of a representation or inducement made by the builder-vendor, nor does it exist by reason of a representation or inducement made by the builder's sales agent, the real estate broker. Instead, it exists *by operation of law.*

The words, "this contract contains the entire agreement between all parties hereto" may be regarded as sufficient to exclude a matter which one of the parties might contend was *in fact* agreed to prior to the signing of the contract. However, standing alone, these words are not sufficient to exclude an *implied warranty,* which is applicable only by operation of law. Such an exclusion, if desired by the parties to a contract for the purchase of a residence, should be accomplished by clear, unambiguous language, reflecting the fact that the parties fully intended such result. *Cf.* N. C. Gen. Stat. § 25-2-316.

Further, it is relevant to note that defendant Fletcher (builder-vendor) was not one of the "parties" to the purchase

contract. He did not sign the contract and nowhere in it is there any reference to him.

[10]  In summary, we hold that plaintiffs were entitled to go to the jury on the issue whether defendant M. D. Fletcher, Jr., breached the implied warranty of a builder-vendor. While defendant Bonnie T. Fletcher also signed the deed of conveyance to plaintiffs as a grantor and vendor of the property, the record contains no evidence that she was in the construction business or had any part in building the residence on Lot No. 9. Therefore, no issue arose as to her liability for any breach of the implied warranty of a builder-vendor.

As to defendants Lonnie E. Wheeler, Wheeler-Leonard & Co., Inc., and Bonnie T. Fletcher, the decision of the Court of Appeals is affirmed. As to defendant M. D. Fletcher, Jr., the judgment of the Court of Appeals is reversed. Accordingly, the cause is remanded to the Court of Appeals for entry of a judgment vacating the judgment of the trial court as to defendant M. D. Fletcher, Jr., and remanding the cause to the District Court for trial *de novo* as to him.

Affirmed in part;

Reversed in part;

Remanded.

Justices COPELAND and EXUM did not participate in the consideration or decision of this case.