Joe MAJOR and Syble Major, Plaintiffs-Respondents,

v.

Burnice M. ROZELL, Defendant-Appellant,

and

Janice L. Rozell Newton Stropp, Defendant.

No. 11770.

Missouri Court of Appeals, Southern District, Division Two.

June 17, 1981.

Bob J. Keeter, Jones, Keeter, Karchmer, Nelms & Sullivan, Springfield, for defendant-appellant.

James L. Eiffert, Ozark, for plaintiffs-respondents.

MAUS, Chief Judge.

This action had its origin in the sale of a new house by the plaintiffs to the defendants in March, 1976. The defendants gave their note to the plaintiffs as part of the purchase price. The defendants failed to pay that note according to its terms. The plaintiffs filed this action to recover upon the note. In turn, the defendant husband filed his counterclaim against the plaintiffs for damages based upon the breach of an "implied warranty of habitability or quality" of the house as enunciated in *Smith v. Old Warson Development Company*, 479 S.W.2d 795, 801 (Mo.banc 1972). The action was tried without a jury and the court entered judgment for the plaintiffs and against the defendants on both the petition and counterclaim. The defendant husband appeals from the adverse judgment on his counterclaim.[1]

He contends the judgment is contrary to the evidence and erroneously declared and applied the law. As the sufficiency of the evidence is in question, a summary of the evidence is necessary.

The respondent husband had developed a subdivision and built and sold 20 to 25 houses before he built the house sold to the appellant. The purchase price of the house was $37,500. The lot upon which that house was located sloped from the east to the west. The house had a concrete footing with a concrete block foundation. The house conformed to the contour of the lot by step-downs in the footing, resulting in a higher foundation on the west side. There was a garage on the east side of the house. The house was split-level and a bedroom was located over the garage. By reason of the contour of the lot and the step-downs in the footing, there was considerable crawl space between the ground and the subfloor on the west end of the house. The earth under the house on the west end was partially excavated for the installation of the furnace and hot water heater. This in effect created a room with dirt walls on two sides and walls consisting of the footing and foundation on two sides. A concrete slab 10 feet by 12 feet was poured on the floor of this room and the furnace and hot water heater placed on that slab. The room was entered by a door to the rear of the house.

The evidence favorable to the appellant's position concerning the asserted breach of warranty was as follows. The defendants moved into the house in March, 1976. Upon the first rain, water entered under the crawl space and accumulated in the room. A complaint was made to the builder and he attempted to correct the problem by raising the height of the dirt around the house. This did not correct the problem. Each time it rained water entered under the house and accumulated in the room. It had accumulated to a depth of 17½ inches in the

---

1. At the time of the transaction the defendants were husband and wife. They were subsequently divorced. It is not clear from the record whether the husband initially or subsequently individually acquired title to the property in question. However, there was no contention in the trial court and none was made in this court that the cause of action was not vested in the husband. The case will be so considered by this court.

room and frequently put out the hot water heater. The builder made other attempts to keep the water out, including putting mortar on the step-down joints and concrete blocks in the bottom of the door to the room. These attempts were also unsuccessful. On each rain of any consequence, water continued to enter under the house and accumulate in the room. As a result, the house was damp, had a peculiar odor, and things mildewed. After the counterclaim was filed, and while the house was occupied by a tenant, the builder placed a sump pump on the concrete slab. The pump would remove the water from the room to the outside of the house. There was evidence the water was washing dirt away from the footing under the house. Appellant's expert said the water was coming under the footing and through the footing and foundation. In his opinion the problem could be corrected by building a retaining wall in the yard and changing the contour of the yard to direct the water away from the house. In his opinion if this is not done the footing will be undermined and "there definitely will be some problems in the future if it is not corrected".

The builder's evidence did not substantially controvert the entry and accumulation of the water under the house as outlined. When the builder went to the house after the first rain, he estimated the water had accumulated to the depth of 8 inches. He confirmed the fact his remedial actions did not stop the entry of the water under the house. He did not observe any appreciable erosion under the house. He explained that a large hole in the earth next to the footing was where a water line entered the house underneath the footing. He stated that he had ordered the installation of the pump sometime prior to the litigation, but that his workmen forgot it. It was not installed until after the appellant's deposition was taken. The builder confirmed the fact that at the time of the trial water still entered under the house although it would be removed by the pump. He concluded the house had no structural defect. He did not consider the fact that water runs under the house to be a structural defect. The build-er's expert did not observe much erosion under the house. He could tell water had been under the house as it was demonstrated by a waterline on the footing, foundation and furnace. He could not tell where the water was entering under the house. It was his conclusion there was no structural defect in the house. However, he added that if it was his house he would try to keep the water out and that no home buyer would like water entering under the house. He concluded, "it should be prepared where there wouldn't be water getting under there, yes".

While the trial court made findings of fact, the basis for its judgment is not clear. The trial court did not find that water did not enter the house as recounted by the evidence above. Nor did it find that such entry had been stopped by the remedial action of the builder. The findings of the trial court in fact recognized the existence "of a water problem in the crawl space beneath the house". There was a finding that at one point water was 17½ inches deep in the crawl space and the hot water heater extinguished. The court did find that "there was no structural damage to the house, the footing, the foundation or wood" and that, barring acts of God or power failure, the sump pump will prevent the hot water heater from being extinguished and "that by the evidence from all parties being considered that the house is habitable". The judgment was apparently based upon these findings.

The fact that people had continuously lived in the house, or that it was habitable, does not defeat the appellant's cause of action. The implied warranty recognized in *Old Warson* has been expressed in various terms. "Although the court's discussion therein of the claimed implied warranty used the terms 'fitness,' 'quality,' 'merchantability' and, ultimately, 'habitability' interchangeably, it is clear that the warranty imposed in *Old Warson* on the builder-vendor was closely analogous to that found in § 400.2–314, which is therein termed 'implied warranty of merchantability'." *O'Dell v. Custom Builders Corp.*, 560 S.W.2d

862, 870 (Mo.banc 1978). Perhaps the best expression was contained in *Old Warson* when the court said, "the test would be one of reasonableness of quality". *Old Warson,* supra, 479 S.W.2d at 801. The fact people could live in the house does not mean the warranty was not breached any more than the fact that an automobile will run, however poorly, means the warranty of merchantability is not breached. *Miller v. Andy Burger Motors, Inc.,* 370 S.W.2d 654 (Mo.App. 1963); *Dubinsky v. Lindburg Cadillac Co.,* 250 S.W.2d 830 (Mo.App. 1952).

■ The full range of defects which constitute a breach of the implied warranty established by *Old Warson* has not yet been defined. Cases dealing with the subject have used the language of structural quality or structural defects. However, the breach of that warranty is not limited to such things as the cracking of the foundation or rotting of floors. Annot., Defective Home—Vendor's Liability 25 A.L.R.3d 383 (1969). It is well established that such warranty is breached by the unanticipated substantial leaking of water into a basement. *Elmore v. Blume,* 31 Ill.App.3d 643, 334 N.E.2d 431 (1975); *McFeeters v. Renollet,* 210 Kan. 158, 500 P.2d 47 (1972); *Jones v. Gatewood,* 381 P.2d 158 (Okl.1963); *Waggoner v. Midwestern Development, Inc.,* 83 S.D. 57, 154 N.W.2d 803 (1967). The same is true of water leaking in the crawl space underneath a house. *Griffin v. Wheeler-Leonard & Co., Inc.,* 290 N.C. 185, 225 S.E.2d 557 (1976).

■ The fact the builder eventually installed a sump pump which would remove water accumulated in the room does not defeat the appellant's cause of action. The house was not designed to have water enter and be removed from the crawl space by a sump pump. The buyers had no reason to think the house was constructed in such a manner that one would be needed. There is a vast difference between a house under which water, with the frequency and in the quantity shown in the evidence, cannot enter and accumulate and a house under which water can so enter and accumulate and be removed by a sump pump. If there could be any doubt concerning the effect of the installation of the sump pump, that doubt is removed by the conclusion of the builder's expert witness, "it should be prepared where there wouldn't be water getting under there, yes".

■ This court concludes the judgment erroneously declares the law and is against the weight of the evidence within the doctrine of *Murphy v. Carron,* 536 S.W.2d 30 (Mo.banc 1976). However, this court cannot finally dispose of the case.

■ The measure of damages for breach of the implied warranty is the difference between the value, at the time of the sale, of the house as warranted and of the house as it was sold or the cost of remedying the defect, whichever is lower. *Matulunas v. Baker,* 569 S.W.2d 791 (Mo.App.1978); *Stamm v. Reuter,* 432 S.W.2d 784 (Mo.App. 1968). However, the cases state the builder should be given notice of and an opportunity to remedy the defect. *Crowder v. Vandendeale,* 564 S.W.2d 879 (Mo.banc 1978); *Old Warson,* supra. By implication, when such notice is given and the builder takes action which does not remedy the defect, but alleviates its consequences, that action should be considered in arriving at the damages. In this case there was evidence of the cost of repair by changing the contour of the lot. The addition of the pump would not change that cost. There was also evidence of the difference in values at the time of the sale. However, the value of the house when sold should take into consideration the remedial action. It is not clear that was done. This court cannot with certainty fix the amount of recovery upon the counterclaim. It must be noted there is no evidence that plaintiff Syble Major participated in building the house. The judgment on the counterclaim in favor of Syble Major is affirmed. The judgment on the counterclaim in favor of Joe Major is reversed and the cause is remanded for a new trial on the counterclaim against Joe Major. The respondents' motion to dismiss the appeal because of appellant's failure to comply with Rule 84.04(d) is overruled.

HOGAN and BILLINGS, JJ., concur.

PREWITT, P. J., recused.