**S–CREEK RANCH, INC., a corporation,
Appellant (Plaintiff below),**

v.

**MONIER & COMPANY et al., Appellees
(Defendants below).**

No. 4179.

Supreme Court of Wyoming.

May 7, 1973.

J. T. Langdon, Worland, William H. Sherwood, Oxford, Neb., for appellant.

Harold Joffe, Worland, for Monier & Co.

Paul B. Godfrey, Cheyenne, for Rome Hill Ranch, Inc., Everette Wyman and Richard Redland.

Before PARKER, C. J., and McEWAN, GUTHRIE and McINTYRE, JJ.

Mr. Justice GUTHRIE delivered the opinion of the court.

Appellant, plaintiff below, asserted its claim against appellees, defendants below, based upon an alleged breach of warranty and the unfitness of certain sheep for the purpose for which it purchased them. The parties will be described in this opinion as they appeared in the district court. Defendant Monier, by way of answer, denied the contentions of the plaintiff and asserted that any losses were resultant from plaintiff's negligence, and that it had failed to mitigate damages, and further that Monier was acting only as an agent of the remaining defendants. By cross-complaint against defendant Rome Hill, Monier claimed for any loss it might suffer by reason of any judgment against it. Defendants Rome Hill, Wyman, and Redland denied the contentions of the plaintiff, asserted its negligence, denied any warranty, and raised the question of failure to give proper notice of the breach to the defendants and to cover, by substitution of animals (§§ 34–2–712 and 34–2–715, W.S.1957, 1971 Cum. Supp.); and by cross-complaint against defendant Monier asserted their entitlement to recover from Monier any judgment against them as a result of this suit.

The matter was tried to the court below and, based upon findings of fact and conclusions of law, judgment was entered in favor of defendants from which judgment plaintiff appeals.

Plaintiff, a Nebraska corporation owned by Elwin E. Moriarity and Eldon Thulin, decided to purchase a number of older pregnant ewes to place upon its land for the purpose of getting a lamb crop and thereafter to sell these ewes, except for a small number which might be retained for the raising of additional lambs. It obtained the services of Charles Gleason, an experienced sheep man, to locate and to help in the selection of a desirable band of sheep. Moriarity and Thulin accompanied Gleason to Worland after Huber, an agent of Monier, had advised them of the availability of certain sheep of that class in the area. Monier & Company acts as a livestock commission firm advertising and offering sheep for sale. After their arrival in Worland on March 22, 1970, they were introduced to the defendant Redland. (There is some dispute as to whether Wyman was present at the first meeting, but this is not material.) After some conversation, Gleason, Moriar-

ity, Thulin, Huber, and Redland left the hotel to inspect two different bands of sheep a few miles east of Worland, both of which bands contained older pregnant ewes and younger ewes. They were satisfied with the sheep in both bands, although the asking price of $45, which included the younger ewes, was in excess of what they could pay. After some negotiations, the parties agreed upon a purchase price of $33 per head for the older pregnant ewes up to 1800 head. It developed that there was not a sufficient number of this class of sheep in the two bands inspected and they were told of the so-called "Holly Band," which was being held on a farm south of Worland where they went to look at additional sheep. After an inspection by Gleason, during which he sorted out approximately 50 head, it was agreed that sheep from this third band would be taken to fill out the number. All of the sheep were to be shipped the next day but the weather conditions made it impossible to load them until March 26, when they were placed upon railroad cars and shipped to Grand Island. All but one of the cars reached Grand Island on March 27 but because of a hot box the sheep from one car were unloaded and fed at Alliance, Nebraska, and reloaded upon two single-deck cars, arriving in Grand Island on March 28. The sheep were billed to the plaintiff, who paid the freight therefor. Prior to their loading they were inspected by both Dr. Asay, who executed a general health certificate, and a brand inspector.

Upon their arrival there were seven dead aborted lambs and three dead ewes, but plaintiff thought nothing of this, attributing it to the strain and stress of shipping and handling. Monier's representative had advised them of the danger of shipping these sheep by rail and suggested they be trucked. They were removed from the cars at Grand Island and taken by truck some 30 miles to Wolbach, Nebraska, where the farm of plaintiff was located. Because of continued abortions, Moriarity became concerned and called Gleason, who on April 3 took two aborted fetuses to North Platte to a University of Nebraska experimental station for examination. No diagnosis of vibriosis was made as a result of this examination. However, upon the advice of Gleason—apparently obtained from a veterinarian—plaintiff fed the sheep certain feed with Vitamin A and other vitamins, but because he became suspicious the entire band of sheep was vaccinated for vibriosis on April 7. The loss continued, however, and on April 12 four aborted fetuses were taken to Dr. DeBrie, a veterinarian in Kearney, who from his examination suspected the presence of vibriosis and made a tentative diagnosis thereof, but lacking laboratory facilities transmitted the fetuses to Dr. Grace at the University of Nebraska at Lincoln, who found after a laboratory examination that these four fetuses were infected with vibriosis, which was the first positive evidence of such disease.

This so-called "abortion storm" continued until May 18, and plaintiff only raised 277 lambs for market, although in addition thereto it lost 35 from overfeeding and other causes. There was also a substantial loss of ewes.

The sheep remaining in the three bands in Wyoming showed no evidence of any infection from vibriosis. There is further considerable evidence from which a trial court might have concluded that the sheep were negligently and carelessly handled after their arrival in Nebraska, that the operation was not conducted in a good and husbandlike manner, and that the ewes suffered considerable weight loss and deterioration of physical condition, which is not a necessary consequence of vibriosis.

There is considerable expert testimony by veterinarians in this case. It would appear without any serious dispute that a definitive diagnosis of vibriosis is not possible without a proper culture and examination and that ewes usually do not show any affirmative signs thereof. Vibriosis is caused by a bacterial organism which affects and causes an infection of the uterus of the pregnant ewe. This acts primarily on the placenta, interfering with the nutrition to the off-

spring. It is oftimes resultant in death of the fetus, and if born the lamb may well be weak. There is no accepted treatment for this disease after the beginning of the so-called "abortion storm." Vaccination is effective only if done before infection. However, although there is no recognized treatment, it was agreed a proper procedure would be that the aborted fetus should be immediately removed from the area of the sheep, or more properly buried directly at that point, and that the ewes which have aborted should be separated from the other sheep at that time. That was not done in this case.

This disease is passed by ingestion and may be spread from the urine or fecal droppings of the sheep and may definitely be transmitted by the licking of an aborted fetus, which is a natural reaction of a pregnant ewe.

As gleaned from the testimony of the experts, the period of incubation of this disease is anywhere from 5 to 21 days with apparently an approximate general average of 14 days, and one of defendants' experts defined "period of incubation" to be the time when the bacterial organisms have become large enough in number to create a problem, which inferentially must be abortion. There is also considerable testimony that stress and improper care of sheep will make them less resistant to this or any disease and that the loss of ewes exceeded that which might normally be expected in an epidemic of this character. It will be observed that in a great many areas there is no real conflict of evidence but the possible inferences sharply conflict.

Although appellant states as a general proposition that the question is who should bear the loss occasioned by this disease, it lists some ten so-called collateral issues upon which this contention is based, some of which will not be mentioned herein because they were not considered necessary or material to disposition, although they have been considered.

## TRANSFER OF RISK OF LOSS

■ In seeking to recover upon an implied warranty the burden is upon the plaintiff to prove that these sheep were suffering from vibriosis at the time the risk of loss had passed to it. There is no question raised by either party nor is any other rule urged, and the trial court proceeded upon that theory. The judgment for the defendants herein is partially based upon Conclusion of Law No. 1, which is as follows:

"That the Plaintiff has failed to establish the existence of vibriosis at the time of the sale to the exclusion of any other cause or causes of disease."

This conclusion is based upon Finding No. 4, which was that the sale of the sheep was totally and fully concluded on March 22, 1970. Plaintiff, however, claims that the risk of loss did not pass to it until the sheep were delivered in Grand Island. This matter requires our disposal because it is the very basis of this suit.

The above finding and conclusion are based upon the complaint of the plaintiff herein wherein it states:

"On or about March 21, 1970, for the initial sum of $58,806.00 in hand paid, Plaintiff procured from Defendants in Washakie County, Wyoming, 1,785 ewes (represented by Defendants to be healthy and pregnant) for delivery to Grand Island and Wolbach, Nebraska, as aforesaid. That said ewes were delivered on March 27–28, 1970.

"That at the time of said delivery, said ewes were suffering from a disease known as Vibrio Fetus disease; the result of which is that they were unable to carry their lambs. That said lambs were aborted stillborn and the lamb crop was a total loss."

The construction which we place thereon is that plaintiff is claiming a so-called "destination contract" with the transfer of the risk of loss based upon the time of the arrival of the ewes in Grand Island. The

rights of the parties do not depend upon the title under the Uniform Commercial Code, Park County Implement Co. v. Craig, Wyo., 397 P.2d 800, 802, and the trial court herein apparently proceeded upon the theory that the risk of loss attached at the time of the sale and relied upon a title concept. There were, however, other things to be done to complete this sale after the buyers departed from Worland. The sheep of this class had to be cut from the younger sheep in the two bands located east of Worland. They were then to be bagged, assembled, and placed in the yards and loaded for shipment to Grand Island in the absence of agents of the plaintiff. This factual situation invokes and brings this transaction within §§ 34–2–509(1)(a) and 34–2–504(a), W.S.1957, 1971 Cum.Supp. A possible inference arises from the fact that the plaintiff itself placed a similar construction upon this agreement when it made no claim or protest at the time the cars were unloaded and seven lambs and three ewes were discovered dead. The applicable rule appears in Hayward v. Postma, 31 Mich.App. 720, 188 N.W.2d 31, 32, as follows:

"* * * Under the Code, risk of loss is no longer determined by which party has title to the goods at the time of the loss. It is determined, instead, by rules in the Code covering specific fact situations independent of title. * * *"

The Hayward case further holds that the parties can validly agree who shall bear the risk of loss but must do so in clear and unequivocal language. It has been phrased another way in the case of Sternheim v. Silver Bell of Rosyln, Inc., 66 Misc.2d 726, 321 N.Y.S.2d 965, 968, wherein it was said:

"It thus appears to be the intent of the statute to shift the risk of loss to the purchaser when the seller has done all which is required of him under the contract. * * *"

■ In connection with appellant's contention that the risk of loss did not attach until the sheep arrived in Grand Island, we find the following from the case of Dana Debs, Inc. v. Lady Rose Stores, Inc., 65 Misc.2d 697, 319 N.Y.S.2d 111, 112:

"The Court decides that this was not a destination contract since there was no express requirement that they be delivered at a particular destination. The word 'require' means that there is an explicit written understanding to that effect for otherwise every shipment would be deemed a destination contract. * * *"

The Dana case then held the risk passed to the buyer upon delivery to the express company. In the instant case we hold that the risk of loss passed to plaintiff at the time the sheep were delivered to the carrier in Worland. Therefore, the trial court must determine if the ewes had vibriosis on March 26 as contrasted to March 22 in order to make proper disposal hereof.

## CONTRIBUTORY NEGLIGENCE

The trial court further concluded (Conclusion No. 2) that plaintiff or its agents and employees were guilty of negligence in the handling and managing of the ewes in question. The court apparently considered this a matter of defense to liability. Because of our view of this case this question will not arise unless the trial court determines from the evidence that the sheep were infected at the time of their delivery to the carrier and if the defendants were liable under a warranty.

■ The claim of plaintiff is based upon the allegation that these ewes were infected at the time of delivery. There is no evidence of acts or actions by plaintiff which could have in any manner caused or contributed to this diseased condition. Therefore, there is no evidence, substantial or otherwise, of contributory negligence. However, the trial court found from what we view as substantial evidence that plaintiff was negligent in the handling and management of these sheep. This necessarily from the facts could only go to the question of damages, being possibly the proximate cause of the loss or amount of loss suffered by plaintiff but being in no way the cause of the disease being present in the pur-

chased sheep, and only aggravating the cause of the damages. This is properly styled "avoidable consequences" and is not properly denominated as contributory negligence. A clear and understandable statement of the application of this doctrine appears in Southport Transit Company v. Avondale Marine Ways, 5 Cir., 234 F.2d 947, 952, wherein it is said:

"'* * * Where the defendant has already committed an actionable wrong, whether tort or breach of contract, then this doctrine limits the plaintiff's recovery by disallowing only those items of damages which could reasonably have been averted * * * [C]ontributory negligence is to be asserted as a complete defense, whereas the doctrine of avoidable consequences is not considered a defense at all, but merely a rule of damages by which certain particular items of loss may be excluded from consideration * * *' * * * McCormick on Damages, West Publishing Company, 1935, Chapter 5, Avoidable Consequences, pages 127 et seq. * * * Recognized universally, it is nonetheless understandable that variable conceptual explanations are given ranging from contributory negligence, as such, lack of proximate cause and a so-called 'duty' to mitigate. * * * But the result desired has a more adequate explanation for, 'In such cases it is not true that the injured person has a duty to act nor that the conduct of the tortfeasor ceases to be a legal cause of the ultimate harm; but recovery for such harm is denied because it is in part the result of the injured person's lack of care and public policy requires that persons should be discouraged from wasting their resources both physical or economic', * * *"

See also Lips v. Opp, 150 Kan. 745, 96 P.2d 865, 867–868; Dippold v. Cathlamet Timber Co., 111 Or. 199, 225 P. 202, 205–206; Barry v. Coca Cola Co., 99 N.J.Super. 270, 239 A.2d 273, 274–276; Pearson v. Butts, 224 Iowa 376, 276 N.W. 65, 69; Jenkins v. Graham, Fla.App., 237 So.2d 330, 332.

## IMPLIED WARRANTY

Plaintiff claims under both an implied warranty of merchantability and fitness of purpose for which the sheep were secured under §§ 34–2–314 and 34–2–315, W.S.1957, 1971 Cum.Supp. The record is clear that all these dealings contemplated the purchase and sale of pregnant ewes to produce a lamb crop and were purchased for no other purpose.

■ Appellees suggest in avoidance of this that the warranty of merchantability (§ 34–2–314) does not, by its language, apply to livestock and contend the language is inapplicable thereto. This section of the Uniform Commercial Code has been applied to livestock in the following cases: Vlases v. Montgomery Ward & Company, 3 Cir., 377 F.2d 846, 849 (chickens); Garner v. S & S Livestock Dealers, Inc., Miss., 248 So.2d 783, 786 (pigs); and Hinderer v. Ryan, 7 Wash.App. 434, 499 P.2d 252, 254 (pigs). The term "goods" has been specifically held to be broad enough to include cattle under an implied warranty, Reed v. Bunger, 255 Iowa 322, 122 N.W.2d 290, 297.

■ Appellees then contend that the evidence does not justify the finding that the plaintiff relied upon the sellers' skill and judgment in buying these pregnant ewes but rather relied upon Gleason's expertise and suggest that because he inspected the sheep an implied warranty is excluded by virtue of § 34–2–316(3)(b). Whether sellers were properly advised of the purpose for which these sheep were acquired and if plaintiff relied upon the skill and judgment of the sellers are questions of fact for resolution by the trial court, because reliance is an element under § 34–2–315 not present in the preceding section. This is recognized in the case of Garner v. S & S Livestock Dealers, Inc., supra, 248 So.2d at 785, which further comments that both warranties may arise at the same time and at the same particular sale. See also Vlases v. Montgomery Ward & Company, supra. The distinction between these two warranties is clearly ex-

pressed in Hinderer v. Ryan, supra, 499 P.2d at 254, where it is said:

"* * * Reliance is not an element of the warranty of merchantability. [Citing statute.] It is an element of the warranty of fitness for a particular purpose. [Citing statute.] * * *"

However, insofar as the inspection is concerned the answer lies in § 34–2–316(3)(b) when it is said:

"* * * there is no implied warranty with regard to defects *which an examination ought in the circumstances to have revealed to him* * * *" (Emphasis supplied.)

The record is here clear that vibriosis would not have been apparent to even a trained veterinarian.

Appellees further argue that an implied warranty is not applicable to latent diseases in livestock, citing Annotation 53 A.L.R.2d 892, 895, which, however, contains cases arising prior to the adoption of the Uniform Commercial Code. In the case of Vlases v. Montgomary Ward & Company, supra, and W & W Livestock Enterprises, Inc. v. Dennler, Iowa, 179 N.W.2d 484, 489–490, sections of the Uniform Commercial Code were applied to diseased chickens in the one case and hogs in the other, and in both instances recovery was based upon latent diseases. See also 1 Anderson, Uniform Commercial Code, § 2–314:10, p. 533 (2d Ed.), relating to unknown defects, and 67 Am.Jur.2d Sales, § 474, pp. 646–647.

## OWNERSHIP OF THE SHEEP IN RELATION TO THE PARTIES

Appellant attacks the court's Finding No. 1 that Rome Hill Ranch, Inc., was owner of the 1785 ewes here involved and appellee Monier attacks Finding No. 3 of the trial court that it was the agent for an undisclosed principal. There is no basis for setting aside either finding, being as they were based upon conflicting testimony, Lukens v. Goit, Wyo., 430 P.2d 607, 611; Dixon v. Ringsby, Wyo., 405 P.2d 271, 275; and cases collected in 1 Wyoming Digest, Appeal and Error, ☞1011(1).

The contention of the appellee Monier that it is not liable upon the warranty for the reason it was the agent for a disclosed principal is removed from our consideration by the finding that it was the agent for an undisclosed principal. We do not understand that any contention is asserted by Monier that an agent for an undisclosed principal is not liable. An agent of an undisclosed principal is subject to all liability, expressed or implied, created by the contract in the same manner as if he were the principal, A. S. Abell Company v. Skeen, 265 Md. 53, 288 A.2d 596, 597; Heinrichs v. Evins, Tex., 486 S.W.2d 935, 937; 3 Am.Jur.2d Agency, § 317, p. 674. The finding that these sheep were the property of Rome Hill absolves defendants Redland and Wyman from any responsibility, they being stockholders of that corporation.

## EVIDENTIARY QUESTIONS

Plaintiff asserts error by the trial court in receiving evidence that the remaining sheep from the three bands did not contract or suffer from vibriosis and attacks the trial court's finding based thereon. Plaintiff's attack is based upon the premise that all the ewes from the so-called "Holly Band" were included in this sale, having overlooked testimony of Thulin that Gleason cut off some ewes that he did not like which he estimated to be approximately 50, along with other testimony in the record. Wyman also mentions that certain sheep were "culled" from the Holly Band and that the sheep remaining from the three bands went to Redland who leased them to Mark Lyman. Additionally, it was stipulated at the trial that if Lyman were called as a witness he would testify as follows:

"* * * that he acquired from Mr. Redland by a lease arrangement the remainder of the sheep from these three bands, which would account for all the remainder of the sheep, including those of Mrs. Patch and Mr. Spencer, and he leased these sheep from Mr. Redland, he kept them and lambed them, had a normal hundred percent lamb crop, no losses from lambs or ewes from vibriosis."

Interestingly, the plaintiff cites a number of cases to sustain its position that this evidence was inadmissible, but the only one dealing with diseased livestock is the case of Anderson v. King, 217 Miss. 140, 63 So.2d 792, 794, which holds that evidence of the death of other hogs in the community was not admissible "when he neither showed nor offered to show that such hogs had been in contact" with the livestock which were subject of the suit. We infer from this citation that had such contact been shown it would have been received. The theory of defendant's defense on this claim is that the ewes were free from disease at the time of delivery. There is a presumption that a condition once existent will continue to exist and evidence of the condition at a subsequent time may be shown under proper circumstances, 32 C.J.S. Evidence § 585, p. 714; 2 Wigmore on Evidence, § 437, p. 414 (3d Ed.). The latter work suggests that no general rule can be stated in this area, and an examination of the cases cited emphasizes this and demonstrates that each case must stand upon its own facts. It is our opinion this evidence was relevant in this matter.

Plaintiff further complains about a finding that certain ewes and lambs were examined in a laboratory in North Platte, Nebraska, and found not to be infected, and alleges this finding was based upon a letter from a Dr. Hibbs to a Dr. Rezac, neither of whom were called as witnesses, and introduced solely for the purpose of impeachment. A finding of fact based partially upon this would be improper, In re Estate of Carey, Wyo., 504 P.2d 793, 800, and cases cited therein. No determination of the correctness of this finding is necessary because of this remand and we are confident this rule will be observed.

This case is therefore remanded with instructions to dismiss the defendants Wyman and Redland and for further disposal in conformity with this opinion.

Remanded for further proceedings consistent herewith.