BEIK et al, *Respondents—Cross-Appellants,*
*v.*
AMERICAN PLAZA CO. et al,
*Appellants—Cross-Respondents.*
(No. 418-345, SC 24707)
572 P2d 305

Miles Sweeney, Portland, argued the cause for appellants—cross-respondents. With him on the briefs were Richard J. Brownstein, David J. Sweeney, and Gilbertson, Brownstein, Sweeney & Kerr, Portland.

Paul R. Meyer, Portland, argued the cause for respondents—cross-appellants. With him on the briefs were Elizabeth Yeats and Kobin & Meyer, Portland.

Before Denecke, Chief Justice, Howell and Lent, Justices, and Gillette, Justice pro tempore.

HOWELL, J.

## HOWELL, J.

This is a suit in equity for specific performance of a contract or, alternatively, for money damages for breach of the contract. The plaintiffs, condominium purchasers, prevailed in the trial court and the defendants appeal.

Defendant American Plaza Company is the owner and developer of a high-rise condominium development in Portland, Oregon, called the American Plaza (Plaza). The Plaza, when completed, is to consist of three multistoried towers, covered parking facilities, a recreation hall, putting green, wine cellar, and other amenities. At present only two of the three towers are completed. W. C. Sivers, Inc. (Sivers), another defendant, was the contractor employed to build the towers and also was part owner of American Plaza Co. at the time of the execution of the contracts between the plaintiffs and American Plaza Co. in 1971, 1972 and 1973. In April of 1975 Sivers became the sole owner of American Plaza Co.

The controversy here focuses on the condition of several condominium units in the second tower, Grant Tower, and whether or not the contracts between the plaintiffs and the developer were breached by the way in which the condominiums were constructed.

The plaintiffs are all owners of condominium units in Grant Tower who purchased their units under a sales agreement which states, in pertinent part:
" THE AMERICAN PLAZA CONDOMINIUM
Sales Agreement
"THIS AGREEMENT, * * * between AMERICAN PLAZA CO., an Oregon Corporation, hereinafter called 'Seller', and _____ * * * hereinafter called 'Purchaser'.
"            WITNESSETH:
"WHEREAS, Seller is the holder of certain rights with respect to parcels of real property located on S.W.

First and Lincoln Streets in the City of Portland, Oregon;

"WHEREAS, the Seller proposes to construct on said property a number of residential buildings in accordance with plans and specifications prepared by Travers-Johnston, Architects, subject to such changes or modifications therein as said architects shall deem appropriate or necessary to effect improvements and betterments to the project, a copy of which plans are on file and available for Purchaser's inspection at the Seller's sales office at the project site;

"WHEREAS, upon completion of such construction the Seller shall file with the recording officer of Multnomah County, Oregon, a declaration to create a unit ownership project pursuant to the provisions of ORS 91.505 to 91.675 to be known as American Plaza, hereinafter called 'Project';

"WHEREAS, Purchaser desires to buy from Seller, and Seller desires to sell to Purchaser a condominium unit in the premises hereinafter described pursuant to the terms, covenants and conditions of this agreement;

"The parties hereto agree as follows:

"1. SALE AND DESCRIPTION OF PREMISES. Seller hereby sells to the Purchaser and Purchaser hereby purchases from Seller:

"(a) Condominium Unit No. _____ in said Project, which is _____ type Unit, in _____ Tower, as shown on said plans as the same may be bettered and improved.

"* * * * *." (Emphasis supplied.)

Plaintiffs contended in the trial court that the defendants breached the sales agreement and sought specific performance of the agreement or, alternatively, damages. Plaintiffs complained specifically that the windows leaked air and water in contravention of the specifications; the sliding glass doors did not conform to the SGD-A3HP performance standard as provided for in the specifications; the air conditioning units were not Remington type EK units as provided for in the specifications; items required in the architect's final inspection had not been completed, such

[ 550 ]

as painting and items of that nature; and the contractor had failed to provide a wine cellar, putting green, roof garden, skylight, rental cars and a minibus. The defendants admit that the specifications were not followed literally, but attempt to argue that variations from the specifications are permissible.

The trial court found for the plaintiffs on all items except the rental cars and minibus. The defendants appeal only from the adverse decision as to the sliding glass doors, air conditioners, putting green, roof garden, and skylight. In all other matters the trial court's decision is not questioned.

The defendant's first several assignments of error all argue that for one reason or another the specifications for construction of Grant Tower are not in the contract between the condominium purchasers and the developer. Defendants argue in succession that the recitals at the top of the sales agreement prefaced by "WHEREAS" are not part of the contract and thus the Remington type EK air conditioner and the SGD-A3HP sliding door specifications are not part of the contract; that if they are part of the contract, they refer only to the plans and not to the specifications of the tower; and that if the contract includes both the plans and specifications, only those specifications authored by the architects, Travers-Johnston, are included in the contract.

■ We think that it is obvious from reading the contract that the whereas clauses, which clearly refer to both plans and specifications, were intended to be included in the contract. We find that all of the plans and specifications are part of the contract.[1]

■ Defendants next argue that if all of the specifications are included in the contract, then paragraph 3.1, Division 1 of General Requirements, is applicable and

[1]The defendants also argue that the plans and specifications were not relied on by the purchasers when they entered into the contract. We do not see how it is relevant here. This is a suit for specific performance of a contract or, in the alternative, damages. It is not an action for misrepresentation.

legitimizes the substitutions made by the contractor. Paragraph 3.1 provides:

"                    MATERIAL SUBSTITUTION

"3.1 Notwithstanding any reference in the specifications to any article, device, product, material, fixture, form or type of construction by name, make or catalogue number, * * * the Contractor, in such cases, may at his option use any article, device, product, material, fixture, form or type of construction which in the judgment of the Owner expressed in writing is equal to that specified. See Instructions to Contractor and Subcontractors for method of requesting approval." (Division 1, p. 1-1, of Specifications Travers/Johnston, Architects.)

The defendant Sivers argues that the above clause allows the contractor to substitute materials with the approval of the owner, and since he was both the owner and the contractor, any substitution actually made was necessarily approved or it would not have been made in the first place. Further, the defendants argue that the provision requiring a writing from the owner is mere verbiage because the owner and the contractor are the same person.

■   The plaintiffs properly point out that at the time of the execution of the contract there was no identity of interest between the owner and the contractor because Sivers was not then the sole owner of American Plaza Co. We think that the lack of identity at the execution of the contract, coupled with the lack of a writing authorizing the substitution, is dispositive of this argument. We do not suggest that a writing would necessarily have been conclusive. A contracting party, under a provision like this one, is required to exercise his judgment in good faith. In adddition to preventing disputes between the owner and the contractor, the writing requirement in Paragraph 3.1 provides some assurance that the owner, when approving a substitution, has actually considered and exercised his judgment about its equivalence. The plaintiffs in this case, who purchased with reference to Paragraph 3.1, are entitled to the benefit of its provisions.

Given the inclusion of the specifications in the contract, defendants next argue that those specifications are only performance standards which have been met by what was actually installed. We shall discuss each item individually.

## SLIDING GLASS DOORS

Each unit contains at least one sliding glass door. Actually, the door installations constitute an entire wall in the living areas of each apartment. They are as wide as 15 feet and consist of two fixed glass panels and a sliding glass door. Some of the units are slightly smaller. The applicable specifications state that "all aluminum sliding glass doors shall meet or exceed SGD-A3HP requirements" which means a high performance heavy duty door. The A3HP door is designed for high-rise buildings and is constructed with high-grade material for maximum performance.

■ The defendants do not actually claim that the doors in place at Grant Tower meet A3HP specifications. Rather, they maintain that they should be permitted to modify the installations at their expense and that such modifications will bring the present doors up to A3HP standards. The modifications proposed by the defendants contemplate two alterations. They propose to secure a heavy metal vertical piece to the outside of the door interlocker and cut down the size of the doors, where needed, to assure that they close more tightly. The evidence is conflicting as to whether or not the doors as modified would perform up to A3HP specifications. From our review of all of the testimony and exhibits, we believe that they would not meet the prescribed performance level. Further, we note that the specifications call for A3HP *requirements,* which differ from the A2 "requirements" in respect to "materials" and "hardware" as well as "performance." It is apparent from the evidence that the material and hardware requirements of the high performance door are significantly different from the A2 installation.

Even if the proposed modifications satisfy perform-
ance requirements, the plaintiffs would still be left, if
this solution were authorized, with a significantly
inferior product from the one contemplated by the
architect's specifications.[2]

## AIR CONDITIONING UNITS

■ The specifications for the air conditioning units
provide, in part, as follows:

"Remington type EK either size as noted in the ar-
chitect's drawings * * *. Units furnished and installed *by
the owner.*" (Emphasis in original.)

The defendants installed Carrier brand air con-
ditioners, and the trial court held that the defendants
were required to install Remingtons. The defendants
argue that the specifications require only that defend-
ants provide an air conditioner of a Remington EK
general quality, which they argue they did. Assuming,
arguendo, that the specifications call for a perform-
ance standard, the defendants must still show that the
substituted air conditioners were as good, or could be
made as good, as the ones specified in the contract. The
evidence in the record does not support that proposi-
tion. The Carrier units, as installed, were inferior to
the Remington units in that they did not have automa-
tic thermostatic contol nor the heating or cooling
capacity provided by the Remington EK units. The

---

[2]The defendants assign as error the admission into evidence of Exhibit
39, which is a catalog for sliding glass doors manufactured by Kawneer.
They argue that parts of the catalog were inadmissible hearsay relied on by
the court below. Plaintiffs introduced the catalog to show the basis of their
expert's testimony. After eliciting the fact that only part of the catalog was
relied on by the witness in formulating his expert opinion, the defendants
objected to the admission of those parts not relied on. The objection was
overruled.

We cannot agree with defendants' assignment of error for two reasons:
(1) on appeal they urge that the exhibit was hearsay but they did not object
on those grounds at trial, and (2) even if the exhibit should have been
excluded, the fact that A3HP doors are high performance doors designed
for high-rise buildings and that A2 doors are designed for low-rise
buildings is independently supported by the testimony of plaintiffs' expert,
Mr. Kirschbaum.

modifications offered by the defendants do not bring the Carrier unit up to the standards of the Remington EK unit. Besides the fact that there is great controversy over whether the modified Carrier cools as efficiently as the Remington, the Remington is a heavier unit; it consists of two components (thus permitting one unit to function while repairs are made to the other unit) while the Carrier consists of a single unit; the Remington operates less expensively; it operates more quietly on the heating cycle; and the Remington has an expected operational life of 20 years as compared to five years for the Carrier unit. In other words, even if the Carrier units were modified as proposed by the defendants, the plaintiffs would still be left with an air conditioning unit significantly inferior to the one described in the specifications.

## DAMAGES

The plaintiffs urged, and the trial court ordered, that the defendants either replace the existing doors and air conditioners with those meeting the specifications or pay the plaintiffs an amount sufficient to have that done. Defendants argue that if they are liable the damages should be measured either by the difference between the value of the condominium with modified A2 doors and modified Carrier air conditioners and the value of the condominium with A3HP doors and Remington air conditioners (diminution in value) or by the difference in cost between the components used and those specified.

The rule in Oregon is that the cost of replacement or repair is the correct measure of damage for defects in work unless that remedy generates undue economic waste. *Schmauch v. Johnston,* 274 Or 441, 547 P2d 119 (1976); *Turner v. Jackson,* 139 Or 539, 560, 11 P2d 1048 (1932). *See also Edenfield v. Woodlawn Manor, Inc.,* 62 Tenn App 280, 462 SW2d 237 (1971). "Only if the cost [of repair] is disproportionate does the standard of difference in value become applicable at all."

McCormick, Damages 647, 650, § 168 (1935).[3] In *Schmauch* the contractor was to build a house for $57,344, and the court awarded over $6,290 in damages for repair. We did not feel that such an award was economically wasteful, imprudent or disproportionate. Here, the price of each condominium was around $40,000, and the cost of repairing the sliding glass doors and air conditioners is about $8,700 per unit. The relationship of cost of repair to purchase price is not disproportionate here, especially considering the lack of a need for a structural change, the loss of habitability suffered by the plaintiffs, and the almost $65,000 that the defendants testified they saved by installing the inferior doors and air conditioners. Further, an award of either the diminution in value or the difference in cost would leave the plaintiffs with an obviously inferior condominium and a sum of money that would be inadequate to bring it up to specifications. It is clear that the only way that plaintiffs can be made whole is to award them the cost of repair.

The trial court held that in view of the fact that this proceeding is in equity, defendants should be given the opportunity to perform the repair work themselves, thus avoiding any overhead or profit included in the

---

[3]McCormick states the rule as follows:

"In whatever way the issue arises, the generally approved standards for measuring the owner's loss from defects in the work are two: First, in cases where the defect is one that can be repaired or cured without undue expense, so as to make the building conform to the agreed plan, then the owner recovers such amount as he has reasonably expended, or will reasonably have to spend, to remedy the defect. Second, if, on the other hand, the defect in material or construction is one that cannot be remedied without an expenditure for reconstruction disproportionate to the end to be attained, or without endangering unduly other parts of the building, then the damages will be measured not by the cost of remedying the defect, but by the difference between the value of the building as it is and what it would have been worth if it had been built in conformity with the contract. * * *." McCormick, Damages 648-49, §168 (1935).

cost figure testified to at trial by plaintiff's expert.[4] In addition, the defendants would by this means have the opportunity to salvage the existing A2 doors and Carrier air conditioning units.

The trial court also held that in the event the repairs were not begun within 60 days, or the defendants indicated before that time that they did not wish to undertake the repairs, the plaintiffs would have a judgment for an amount equal to a bid by Reimers and Jolivette, plaintiffs' expert at trial, for the installation of the appropriate doors and Remington type EK air conditioners in the plaintiffs' units.[5]

We believe the trial court's solution is reasonable. Since the time set by the trial court has expired, the trial court should set another time within which the defendants should start the repairs and a reasonable time to complete them. In the event defendants do not wish to undertake the repairs or the defendants do not start the repairs within the time allowed by the court, the plaintiffs should have a judgment for an amount necessary to replace the doors and air conditioners. In determining the amount, the trial court may consider, but is not bound by, any bid submitted by Reimers and Jolivette, Inc.

## AMENITIES

The trial court found that a number of amenities which were supposed to have been provided by the contract have not, in fact, been provided. The court held that the contractor had an obligation to provide a

---

[4] At trial, Larry Beckius, a contractor with the firm of Reimers and Jolivette, Inc., testified that a reasonable estimate of the cost of replacing both the sliding glass doors and the air conditioners in plaintiffs' condominiums would be about $123,000. Of that figure, about $75,000 represents the cost of replacing the sliding glass doors.

[5] A few of the plaintiffs have altered their doors at their own expense. We think it would be equitable to allow them to choose between the remedies available in this decree and being reimbursed for their expenses. Additionally, plaintiffs Taylor have already replaced their Carrier unit with a Remington unit. Defendants, regardless of which course they take for the other units, must compensate the Taylors in an amount equal to the actual cost to them of the change.

skylight in the recreation hall, paint a particular wall, and furnish a wine cellar. Further, the court held that the contractor must continue to tender a putting green and a roof garden to the Association of Unit Owners (Association) for one year, even though they have refused those amenities in the past.

On appeal, defendants argue that they should not be obligated to provide a skylight in the recreation building or to continue to tender the roof garden and putting green. They note that the plans and specifications for these amenities are contained only in the plans and specifications for the recreation center and the first tower, which are separate buildings. They argue that these plans and specifications were not intended to be part of the contracts at issue here.

■ We think this argument is without merit. The second "whereas" clause refers to buildings in the plural, and although it refers to residential buildings, the contract and the construction as a whole anticipates common areas and other buildings. A drawing on page 2 of the plans for Grant Tower shows a recreation center and the other towers. Moreover, it seems obvious from the entire project that these amenities were planned, not for some third parties who have no connection with the project, but for those who live or will live in the towers. The amenities are thus part of the contract and must be provided.

Defendants also note that they tendered the putting green and the roof garden, but these were refused by the Association and therefore that refusal should relieve defendants of any obligation in that regard. The Association is designed to be a representative group of unit owners charged with the responsibility of maintaining the common areas of the Plaza, including the recreation center. The Association was eventually to be composed of residents from each tower, but at the time of the tender only residents of the first tower (Lincoln) were voting members of the Association. In light of plaintiffs' inability to participate in the

rejection of the putting green and roof garden, we agree with the trial court that the equitable solution in this situation is to require the defendants to continue to tender these amenities to the Association for one year. This will give the plaintiffs an opportunity to participate in the Association's decision to accept or reject the tender.

In summary, our examination of the record in this suit discloses a situation where a developer-contractor failed to live up to his agreement with the purchasers of the units. The litigation, in both the trial court and this court, could have been obviated had the defendants made a reasonable effort to construct the units as they had agreed. The defenses suggested are technicalities and the offered substitutions inadequate. In general, it appears that this is another example of a development which has not lived up to the prior representations. *See, e.g., Franklin v. City of Lake Oswego,* 267 Or 452, 517 P2d 1042 (1973).

We hold that the contract between the plaintiffs, as condominium purchasers, and the defendants includes the plans and specifications of Grant Tower and the common areas; that those plans and specifications call for the installation of A3HP sliding glass doors, Remington type EK air conditioners, a skylight, a roof garden and a putting green; that defendants failed to install these items; that defendant's proposed modification of the sliding glass doors and air conditioners will fail to bring the items up to the contractual specifications; and that, as a remedy, defendants must replace the sliding glass doors with those meeting the A3HP specifications, install Remington type EK air conditioners, install a skylight, and continue to tender a roof garden and a putting green to the unit owners' association.

■ Finally, plaintiffs cross appeal, claiming that $16,836.25, the amount of attorney fees awarded by the trial court, was insufficient. Plaintiffs argue that

the trial judge merely set an hourly rate and multiplied the number of hours worked by the rate he found reasonable, thus failing to consider such elements as the risk of loss, the complexity of the case, and other business the attorney did not take because of this case. Plaintiffs fail to consider the possibility that the trial judge took all of these factors into consideration in setting the hourly rate. Our review of the evidence leads us to conclude that the award was a reasonable estimate of the value of the attorney fees in this case.

Affirmed and remanded for further proceedings consistent with this opinion.