Joseph MATULUNAS,
Plaintiff-Respondent,

v.

W. H. BAKER and Linda M. Baker, husband and wife,
Defendants-Appellants.

No. 10349.

Missouri Court of Appeals,
Springfield District.

Aug. 4, 1978.

Milton B. Kirby, Bruce K. Kirby, Kirby, Lewis & Cohick, Springfield, for defendants-appellants.

Richard T. Martin, Gainesville, for plaintiff-respondent.

Before BILLINGS, C. J., and TITUS and FLANIGAN, JJ.

FLANIGAN, Judge.

Plaintiff Joseph Matulunas brought this action against defendants W. H. Baker and Linda M. Baker, husband and wife, based upon a breach of implied warranty with respect to the condition of a new house sold

by defendants to plaintiff. The jury found in favor of plaintiff and awarded him $1,421.71. Defendants appeal.

Defendants' first "point relied on" is that the evidence is insufficient to support the verdict. More specifically, defendants contend that two of the elements set forth in Instruction No. 3, plaintiff's verdict-director, lacked evidentiary support. Defendants do not contend that Instruction No. 3 was inappropriate or in any manner improper in content.

The instruction, based on MAI 25.03, reads:

"Instruction No. 3

Your verdict must be for plaintiff if you believe:

First, defendant sold the house to plaintiff, and

Second, the defendant knew or should have known by using ordinary care of the use for which plaintiff purchased the house, and

Third, plaintiff reasonably relied upon defendants' judgment as to the fitness of the house for such use, and

Fourth, the house was not fit for such use, and

Fifth, as a direct result plaintiff was damaged."

Defendants claim that the evidence was insufficient to support a finding of the following: (a) "reasonable reliance on the part of plaintiff," and (b) "damage to plaintiff as the result of defendants' acts." Defendants' assertion is, in effect, that paragraph Third and paragraph Fifth are not supported by the evidence.

In ruling defendants' attack upon the sufficiency of the evidence this court must consider the evidence in the light most favorable to the plaintiff. Plaintiff is to be accorded the benefit of every reasonable inference to be derived therefrom and defendants' evidence, unless favorable to the plaintiff, must be disregarded. *Depper v.*

*Nakada,* 558 S.W.2d 192, 194[1] (Mo.App. 1977). *Martin v. Barbour,* 558 S.W.2d 200, 203[1] (Mo.App.1977); *Forbis v. Associated Wholesale Grocers, Inc.,* 513 S.W.2d 760, 763[1] (Mo.App.1974).

Defendant W. H. Baker, who is a general contractor, built the house.[1] Construction of it was completed around September or October, 1971. On December 9, 1971, plaintiff, as buyer, and defendants, as sellers, entered into a contract for a deed by the terms of which plaintiff was to pay the purchase price in monthly installments. The deed was to be delivered upon full payment. Plaintiff had the right of prepayment. The record does not show when full payment was made, but the defendants executed and delivered to plaintiff a general warranty deed on February 22, 1972.

Before the contract for deed was entered into, defendant Baker showed plaintiff two houses which Baker had built, a white house and a yellow house. Plaintiff bought the white house. Before the purchase was made, Baker informed plaintiff that the white house was much better than the yellow house, although both houses "met or exceeded FHA standards in all respects." The white house, Baker said, had many extra features which the yellow house lacked. Baker had built approximately 20 houses in Missouri and he told the plaintiff that the white house was the best one he had built and that "it was a deluxe model."

The lawsuit, filed in early 1975, was occasioned by the fact that the "subflooring" throughout 95 percent of the house rotted out and had to be replaced. In their prepurchase negotiations Baker and plaintiff had looked under the house. Baker told the plaintiff that the floor was "insulated" but made no other statement concerning the floor.

In May, 1972, plaintiff, who had moved into the house the preceding December, detected a "musty smell" and noticed that the floor "started to crack a little bit." Some

---

1. The record is not clear but it may be that defendant Linda M. Baker had no part in the construction of the house. As the opinion reflects, both defendants were the sellers of the house. Defendant Linda makes no claim that her liability position differs from that of her husband.

of the floor tiling required replacement and plaintiff asked Baker to replace it. Baker agreed to do so but failed to keep that promise.

After plaintiff had lived in the house approximately a year, the floor throughout the house began to squeak. Plaintiff got under the house and cut out a layer of polyethylene film, called Vis Queen, which was "between the joists and the subflooring." After the Vis Queen had been removed, plaintiff saw that the subflooring was "soaking wet and chipping off." Plaintiff informed Baker "that the floor had rotted out." Baker agreed to repair the floor but failed to do so.

The floor "got progressively worse" and "actually gave in in the shower room and [plaintiff] went through one part of it." In December, 1974, plaintiff replaced the entire floor except for two small areas which did not require replacing. Photographs were introduced showing the floor in its defective condition. Plaintiff's evidence showed that the rotting of the subflooring was caused by an accumulation of water between two layers of Vis Queen. One layer was between the floor joists and the subflooring and the other layer was between the subflooring and the "underlayment." This "sandwiching" of the subflooring between the two plastic layers caused the accumulation of water and, according to plaintiff's experts, constituted improper construction. Plaintiff, who had retired after 26 years in the air force, had had very little experience "with construction or building—not enough to comment on." He admitted that when Baker showed him the white house, "I noticed the plastic."

■ In *Smith v. Old Warson Development Company*, 479 S.W.2d 795 (Mo. banc 1972) our supreme court held that "implied warranties of merchantable quality and fitness exist in the purchase of a new home by the first purchaser from a vendor-builder." In *Old Warson* the court enunciated the following principles which apply to litigation of this type. The liability imposed for breach of an implied warranty is of "tort nature" and, in Missouri, the difference between "strict liability" or "implied warranty" is not one of substance. Implied warranties of "merchantable quality" and "reasonable fitness for use" are derived from the common law. The doctrine of implied warranty may be utilized to recover the difference between the value of the product as warranted and its actual value. Negligence, knowledge, or fault of the vendor need not be shown.

■ Reasonableness of quality or fitness is "essentially" a fact issue for the jury although, of course, there must be sufficient evidence to justify a finding of lack of reasonable quality and fitness. In keeping with a substantial trend to abandon the strict rule of *caveat emptor*, recovery by a purchaser of a new house, on a theory of breach of an implied warranty of habitability or quality, "is applicable only against that person who not only had an opportunity to observe but failed to correct a structural defect, which, in turn, became latent, i. e., the builder-vendor." It is immaterial whether the latent defect resulted solely from the activities of the builder-vendor or from the activities of an independent contractor used by him. The builder-vendor is not required to construct a perfect house. The test is one of reasonableness of quality. The duration of liability is also premised on a standard of reasonableness.

Also in *Old Warson* the court pointed out that the structural quality of a house, by its very nature, is "nearly impossible to determine by inspection after the house is built" because many of the elements of its construction are hidden from view. Moreover, the ordinary purchaser "can determine little about the soundness of the construction but must rely upon the fact that the vendor-builder holds the structure out to the public as fit for use as a residence, and [as] being of reasonable quality."

In *O'Dell v. Custom Builders, Inc.*, 560 S.W.2d 862 (Mo. banc 1978) the supreme court had occasion to discuss its holdings in *Old Warson*. The court, at p. 870, said:

"In *Old Warson* we held that a common law warranty of habitability or quality will

be implied in law in the sale of a new home by a builder-vendor so as to protect the purchaser against latent structural defects. Although the court's discussion therein of the claimed implied warranty used the terms 'fitness,' 'quality,' 'merchantability' and, ultimately, 'habitability' interchangeably, it is clear that the warranty imposed in *Old Warson* on the builder-vendor was closely analogous to that found in § 400.2–314, which is therein termed 'implied warranty of merchantability.'"

The court in *O'Dell* pointed out that both the common law warranty and the "statutory codification thereof" contained in § 400.-2–314 V.A.M.S. require that the product be reasonably fit for the ordinary purposes for which it is used. The primary significance of *Old Warson*, said the court in *O'Dell*, "lies not in its recognition of the warranty of merchantability but in its extension of the warranty by analogy to the sale of a completed new home."

■ As previously stated, defendants here make no complaint concerning the appropriateness of MAI 25.03 for use on the instant facts. Their complaint is that some of the factual requirements of the instruction were not met. First, defendants argue, the record fails to show the element of "reliance"[2] on the part of the plaintiff.

Defendants say that during plaintiff's pre-purchase inspection of the house plaintiff "noticed the plastic when he was under the house" and that it was one of the "additional features" which led plaintiff to buy the house. Plaintiff, say defendants, was "fully apprised of the condition of the house and made his decision to purchase the house based upon the feature which plaintiff now claims was a breach of warranty."

There was, however, no evidence that plaintiff, prior to the purchase, was aware of the fact that *two* layers of Vis Queen had been used, nor was there evidence that plaintiff knew such use constituted improper construction. Defendant Baker admitted that he had told plaintiff that the white house "was a good sound constructed house, better constructed than the yellow house, it cost more money to build, it was a good home." Baker also informed plaintiff that the white house "was a deluxe model." Plaintiff knew that defendant Baker was an experienced builder and plaintiff also knew that he himself had little or no experience "with construction or building." The evidence permitted the reasonable inference that plaintiff did in fact rely upon Baker's judgment as to the fitness of the house for plaintiff's use as a residence. The mere fact that plaintiff had seen one of the layers of Vis Queen prior to the purchase does not destroy that inference. There is no merit in defendants' contention that the "reliance" element of paragraph Third of Instruction No. 3 lacked evidentiary support.

Defendants cite *Barrett v. Jenkins*, 510 S.W.2d 805 (Mo.App.1974) in support of their claim that plaintiff relied upon his own inspection and not upon defendants' judgment. The facts in *Barrett* are readily distinguishable from those here. In *Barrett* defendant built the house in accordance with plans and specifications furnished him by the *plaintiff.* The court in *Barrett* dis-

2. As previously pointed out in this opinion, the supreme court held, in *O'Dell*, that the warranty imposed in *Old Warson* on the builder-vendor is closely analogous to that found in § 400.2–314 V.A.M.S., which is therein termed "implied warranty of merchantability." § 400.-2–314 is identical to § 2–314 of the Uniform Commercial Code. The following authorities hold that "reliance" is *not* an element of the warranty of merchantability under § 2–314: *U. S. Fibres, Inc. v. Proctor & Schwartz, Inc.*, 509 F.2d 1043, 1046[6] (6th Cir. 1975); *Eichenberger v. Wilhelm*, N.D., 244 N.W.2d 691, 696[6] (1976); *S–Creek Ranch, Inc. v. Monier & Co.*, Wyo., 509 P.2d 777, 782[6] (1973); *Hinderer v.*

*Ryan*, Wash.App., 499 P.2d 252, 254[1] (1972); *Robinson v. Williamsen Idaho Equipment Co.*, Idaho, 498 P.2d 1292, 1301[21] (1972). See Anderson, Uniform Commercial Code (2d Ed., Vol. 2, § 2–314:14, p. 537.)

"[T]he implied warranty of fitness for the particular purpose is given when the buyer is relying on the seller's skill and judgment to select or furnish suitable goods. On the other hand, there is no [Uniform Commercial] Code provision expressly indicating that there must be reliance in connection with the implied warranty of merchantability." 63 Am.Jur.2d Products Liability § 96, p. 101.

tinguished that situation from the one in *Old Warson* (and here), the latter involving the purchase from defendants of a *completed* home.

In support of their contention that paragraph Fifth of Instruction No. 3 was not supported by the evidence, defendants argue that the rotting of the flooring was not due to defendants' improper construction but was due to plaintiff's conduct in leaving wet towels and wet mats on the bathroom floor.[3] It was also due, say defendants, to the fact that plaintiff "kept the vents in the foundation closed during the winter time." The evidence concerning the wet towels and mats emanated solely from defendant Baker and, unless it is favorable to plaintiff [defendants insist it is unfavorable] it must be disregarded in determining the sufficiency of the evidence.

Plaintiff did admit, on cross-examination, that in the winter time he closed the vents in the foundation. There was, however, no testimony from plaintiff that that fact had any causal connection with the rotting of the subfloor. Defendant asks this court to interpret his own testimony as showing such causation but that testimony, even if subject to that construction, is of no aid to plaintiff and may be disregarded. Plaintiff's evidence was to the effect that the rotting was caused by defendants' installation of the two layers of Vis Queen.

There is no merit in defendants' contention that paragraph Fifth of Instruction No. 3 lacked evidentiary support. It follows that defendants' first "point relied on" has no merit.

Defendants' second "point relied on" is that the trial court erred in giving Instruction No. 5, MAI 4.01, the measure of damages instruction tendered by plaintiff, for the reason, say defendants, that MAI 4.02 is the instruction which should have been given. Plaintiff counters that even if the giving of Instruction No. 5 was error, defendants were not thereby prejudiced.

The trial took place in January, 1976. At that time the only MAI instructions which plaintiff's counsel here might have considered as being appropriate were MAI 4.01 (Measure of Damages—Personal and Property), MAI 4.02 (Measure of Damages—Property Only), and MAI 4.03 (Measure of Damages—Property—Misrepresentation).

If MAI 4.02 was the one which should have been used, authority exists that the use of MAI 4.01 in its stead was prejudicial error. *State ex rel. State Highway Commission v. Beaty*, 505 S.W.2d 147, 154[7] (Mo.App.1974); *Ogle v. Terminal Railroad Association of St. Louis*, 534 S.W.2d 809, 812 (Mo.App.1976). Neither of those cases, however, involved breach of an implied warranty of habitability of a new house.

In *DeArmon v. City of St. Louis*, 525 S.W.2d 795 (Mo.App.1975) defendant, on a given day, caused damage to plaintiff's building while razing an adjacent structure. The St. Louis district of this court, in approving the trial court's use of MAI 4.02, said, "There is no doubt that MAI 4.02 is an applicable MAI here." The court also set forth the rules governing the measure of damages for "injury to real property." It pointed out that the measure of damages, generally, is "the difference in value immediately before and immediately after the event causing the injury (diminution-in-value test) . . . However, where damage to land or a building thereon can be restored to its former condition at a cost less than the diminution in value, cost of restoration becomes the measure. . . . Courts have said that the cost-of-repair test is an exception to be used only where the amount of damages is insignificant as compared to the value of the property as a whole and involves only a small part thereof." *DeArmon*, at p. 800.

Defendants make no reference to the possible use or modification of MAI 4.03. The Notes on Use under MAI 4.03 read as follows:

---

3. Defendant Baker testified that he went to plaintiff's bathroom "on many occasions, I have got a kidney problem."

"This damage instruction is to be used where plaintiff is suing for misrepresentations. *It may also be used in breach of warranty cases (where supported by the evidence) if plaintiff elects this measure of damages. Where plaintiff has evidence of other damages (such as personal injuries suffered because the property was not as warranted), MAI 4.01 should be used.*" (Emphasis added.)

The Notes on Use [Supplemental] to MAI 4.02 have a "cost of repair" alternative but no such alternative is specifically stated for MAI 4.03.

Plaintiff's evidence showed that, "by reason of the defective condition of the floor," the fair market value of the real estate was decreased "by at least $3,000." In effecting the repairs, plaintiff hired a carpenter and purchased materials. The carpenter's bill was $476 and the materials cost $945.71. The sum of those two figures is the amount of the verdict. Plaintiff also testified that he and his wife had worked for 214 hours in connection with the floor repair and had incurred other expenses, all of which plaintiff estimated at $1,297.66.

Neither side has cited a Missouri[4] case addressing the question of the proper measure of damages instruction to be used in an action of this nature. In *Smith v. Old Warson Development Company*, 479 S.W.2d 795 (Mo. banc 1972), discussed previously in this opinion, the court at p. 798 said: "In addition to the use of the theory of implied warranty to recover for personal injuries or property damage, the doctrine has also been successfully utilized to recover the difference between the value of the product as warranted and its actual value."

Missouri courts have dealt with the use of the appropriate measure of damages in cases involving the breach of a construction contract. Several are collected in 76 A.L. R.2d 805 (Cost of correction or completion, or difference in value, as measure of damages for breach of construction contract). See for example *Hotchner v. Liebowits*, 341 S.W.2d 319, 332[25] (Mo.App.1960) and *Southwest Engineer Co. v. Reorganized Sch. Dist. R–9*, 434 S.W.2d 743, 751[20] (Mo. App.1968).

In the case at bar defendants did not contract to build a house for plaintiff.

---

4. Courts in other states, which permit a purchaser of a new house to recover from the builder-vendor for breach of an implied warranty of habitability, have made various statements concerning the appropriate measure of damages.

"When the warranties of workmanlike construction or suitability for habitation are breached, damages may be measured in two ways. The ordinary measure is the difference between the actual value at the time of sale and what the value would have been if it had been as warranted. When, however, the buyer retains the property, the measure of damages may appropriately be the cost of bringing the property into conformity with the warranty." *Hoagland v. Celebrity Homes, Inc.*, Colo.App., 572 P.2d 493, 494[4, 5] (1977).

"[T]he cost of remedying the defects or deficiencies is the proper measure of damages for defective or deficient construction." *Hanavan v. Dye*, 4 Ill.App.3d 576, 281 N.E.2d 398, 401[2] (1972).

"[T]he vendee can maintain an action for damages for such breach 'either (1) for the difference between the reasonable market value of the subject property as impliedly warranted and its reasonable market value in its actual condition, or (2) for the amount required to bring the subject property into compliance with the implied warranty.' " *Griffin v. Wheel-*

er-Leonard & Co., Inc., 290 N.C. 185, 225 S.E.2d 557, 567[6, 7] (1976).

"The measure of damages has been held to be the market price or reasonable cost of correcting the defects." *Centrella v. Holland Construction Corp.*, 82 Misc.2d 737, 370 N.Y.S.2d 832, 835[5] (1975).

"The rule in Oregon is that the cost of replacement or repair is the correct measure of damages for defects in work unless that remedy generates undue economic waste. . . . 'Only if the cost [of repair] is disproportionate does the standard of difference in value become applicable at all.' " *Beik v. American Plaza Co.*, 280 Or. 547, 572 P.2d 305, 310 (1977).

"[T]he measure of damages for construction defects which can be remedied without impairing the building as a whole is the reasonable cost of remedying the defects." *Moore v. Werner*, 418 S.W.2d 918, 920[9] (Tex.Civ.App. 1967).

Where the defects were "curable by repair or replacement, . . . the reasonable expense of such remedial action is highly probative of the difference in value between the house as warranted and the house as built. . . . No error appears in the general use by the trial court of reasonable remedial expense as a measure of recovery." *Bolkum v. Staab*, 133 Vt. 467, 346 A.2d 210, 212[3–5] (1975).

They sold him a completed house and the land on which it was situated. In some cases the value of the house would constitute a major percentage of the value of the house and land considered as a unit. In others the value of the house alone might be only a small part of the value of the house and land. Building contract cases, where the defendant's contractual obligation is limited to the structure itself, may be helpful but not necessarily controlling. Frequently in actions involving damage to real estate, such as *DeArmon*, supra, only one occurrence, taking place on a specified date, is involved. The rotting of the floor here was a gradual development, although it may be argued that the rotting was the effect of the latent defect rather than the defect itself, the latter being the improper sandwiching of the Vis Queen. These factual distinctions may require appropriate tailoring of verdict-directing and measure of damages instructions.

It is at least arguable that plaintiff's counsel here was justified in not using MAI 4.02, or a modification thereof, because (a) MAI 4.03 might have been more appropriate—the Notes on Use under 4.03 do make specific mention of "breach of warranty cases," and (b) the house here was not "damaged," at least in the sense that it suffered from the effects of an outside force occurring on a specific occasion.

It is also arguable that plaintiff's attorney concluded not to use MAI 4.03 because his evidence was to the effect that the damages under the "diminution-in-value test" were greater than those under the "cost of repair test,"[5] *De Armon*, supra, and MAI 4.03 did not contain the "reasonable cost of repair" alternative which is found in the Notes on Use [Supplemental] to MAI 4.02.

In *O'Dell v. Custom Builders Corporation*, 560 S.W.2d 862 (Mo. banc 1978), the theory of liability was not the same as the theory advanced in *Old Warson* and in the case at bar. However, *O'Dell* involved defects in a house occasioned by faulty design and faulty construction. A modified form of MAI 4.01 was used. Although the instruction was not specifically attacked on the ground advanced by defendants here, the court found no error in its use.

If the trial court erred in giving Instruction No. 5, an issue which is left undecided, and if this court found the error to be a prejudicial one, and this court finds otherwise, the case would be remanded for retrial on the issue of damages only. The verdict was clearly for the right party and defendants would not on this record be entitled to a retrial on the liability issue.

"No appellate court shall reverse any judgment, unless it finds that error was committed by the trial court *against the appellant*, materially affecting the merits of the action." (Emphasis added.) Rule 84.-13(b). This court has seen the photographs showing the defects. The verdict represented the total of repair expenses incurred by plaintiff, documented by cancelled checks and material bills. Defendants did not dispute these items nor did they dispute plaintiff's evidence that he (and his wife) had done additional repair work for which they requested, but the jury denied, recovery. Defendants make no claim here that the verdict was excessive. This court concludes that defendants were not prejudiced by the giving of Instruction No. 5.

The judgment is affirmed.

All concur.

---

5. In *Stamm v. Reuter*, 432 S.W.2d 784 (Mo. App.1968), a suit by homeowners against a contractor who had installed a defective roof, plaintiffs' evidence showed that the cost of installation of a new roof and the amount of "necessary expenditures for cleaning, paint and other items," totaled $3,333.55. Plaintiffs' evidence also showed "that the difference in market value of their residence with the leaky roof and what it would have been with a good roof was from $5,000 to $6,500." The court held that $3,333.55 was the limit of plaintiffs' recovery "since that sum will make them whole."